RECORD NO. 12-1305

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals
### For The District of Columbia Circuit

**ALLIANCE FOR SAFE, EFFICIENT AND COMPETITIVE TRUCK TRANSPORTATION;
AIR & EXPEDITED MOTOR CARRIERS ASSOCIATION; THE EXPEDITE
ASSOCIATION OF NORTH AMERICA; NATIONAL ASSOCIATION OF SMALL
TRUCKING COMPANIES; TRANSPORTATION LOSS PREVENTION AND SECURITY
ASSOCIATION; ALLEN LUND COMPANY, INC.; BOLT EXPRESS, LLC;
BP EXPRESS, INC.; CARRIER SERVICES OF TENNESSEE, INC.; CONARD
TRANSPORTATION, INC.; DES MOINES TRUCK BROKERS, INC.;
FORWARD AIR, INC.; MEDALLION TRANSPORT & LOGISTICS, LLC;
REFRIGERATED FOOD EXPRESS, INC.; SNOWMAN RELIABLE EXPRESS, INC.;
TRANSPLACE, LLC; TRIPLE G EXPRESS, INC.,**

*Petitioners*,

v.

**FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION;
RAYMOND L. LAHOOD, in his official capacity as Secretary of Transportation,**

*Respondents*.

## ON PETITION FOR REVIEW FROM THE
## FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION

———————————

## BRIEF OF PETITIONERS

———————————

David E. Frulla
Shaun M. Gehan
KELLEY DRYE & WARREN LLP
3050 K Street, NW, Suite 400
Washington, DC  20007
(202) 342-8400

Henry E. Seaton
SEATON & HUSK, L.P.
2240 Gallows Road
Vienna, Virginia  22182
(703) 573-0700

Mark J. Andrews
STRASBURGER & PRICE, LLP
1700 K Street, NW, Suite 640
Washington, DC  20006
(202) 742-8601

*Counsel for Petitioners*          *Counsel for Petitioners*          *Counsel for Petitioners*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

1. **Parties and Amici.** The Petitioners in this case are as follows:

> Alliance for Safe, Efficient and Competitive Truck Transportation
> Air & Expedited Motor Carriers Association ("AEMCA")
> The Expedite Association of North America ("TEANA")
> National Association of Small Trucking Companies ("NASTC")
> Transportation Loss Prevention and Security Association
> Allen Lund Company, Inc.
> Bolt Express, LLC
> BP Express, Inc.
> Carrier Services of Tennessee, Inc.
> Conard Transportation, Inc.
> Des Moines Truck Brokers, Inc.
> Forward Air, Inc.
> Medallion Transport & Logistics, LLC
> Refrigerated Food Express, Inc.
> Snowman Reliable Express, Inc.
> Transplace, LLC
> Triple G Express, Inc.

The Respondents are the Federal Motor Carrier Safety Administration and The Honorable Raymond L. LaHood in his official capacity as Secretary of Transportation. Undersigned counsel at this writing are aware of two prospective amici, both in support of Petitioners: the Airforwarders Association and the National Confectionary Logistics Association. Because the agency action at issue here was published without any prior notice or opportunity for public comment, Petitioners are unable to list any parties who participated in proceedings below.

**2. Rulings under Review.** The rules, regulations and/or agency action at issue before this Court include the following documents released by Respondents through publication on May 16, 2012, at one of their websites, csa.fmcsa.dot.gov:

**a.** No. FMC-CSA-12-011, entitled *CSA: A Way to Measure and Address Commercial Motor Vehicle Safety" (Industry Briefing, May 2012)* (Joint Appendix ("JA") 0070-0126);

**b.** Unnumbered document entitled *Shipper and Insurer Briefing Addendum, May 2012 (FMCSA Data for Shippers, Brokers, and Insurers) )* (JA 0127-0153);

**c.** No. FMC-CSA-12-013, entitled *Just the Facts about SMS)* (JA 0154), and

**d.** No. FMC-CSA-12-014, entitled *FMCSA Data – Information for Shippers, Brokers, and Insurers)* (JA 0155).

Each of the foregoing documents (collectively referred to as the "FMCSA Release") was attached to the Petition For Review filed with this Court on Monday, July 16, 2012.

**3. Related Cases.** The instant case has not previously been before this Court or any other court. There is no related case pending in this Court or any other court of which undersigned counsel are aware. Issues raised in this case do relate, however, to claims addressed in *National Association of Small Trucking*

*Companies v. FMCSA*, No. 10-1402, 2011 U.S. App. LEXIS 7403 (D.C. Cir. March 10, 2011) ("*NASTC*"), which was concluded by means of a settlement agreement reached among the parties through mediation under the auspices of this Court. In Petitioners' view, the FMCSA Release (among its other legal defects) violates that settlement agreement. In addition to Petitioner NASTC and Respondent FMCSA, Petitioners AEMCA and TEANA also were parties to that case.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to the requirements of Fed. R. App. P. Rule 26.1, and in order to permit members of this Court to make a determination of whether they have any financial interests in any Petitioner which would require consideration of recusal, the undersigned counsel of record for all Petitioners hereby certify that, with one exception, neither Petitioners nor any of their parent companies, subsidiaries or affiliates have any outstanding securities in the hands of the public. The exception is Petitioner Forward Air, Inc. It is a wholly-owned subsidiary of Forward Air Corporation, a publicly-traded company (NASDAQ: FWRD) that is headquartered in Greeneville, Tennessee and is incorporated under the laws of the State of Tennessee.

Respectfully submitted,

/s/ David E. Frulla
Shaun M. Gehan
KELLEY DRYE & WARREN, LLP
Washington Harbour, Suite 400
3050 K Street, N.W.
Washington, DC  20007-5108
Telephone: (202) 342-8400
Facsimile: (202) 342-8451
E-mail: dfrulla@kelleydrye.com;
sgehan@helleydrye.com


/s/ Henry E. Seaton
SEATON & HUSK, L.P.
2240 Gallows Road
Vienna, VA  22182
Telephone: (703) 573-0700
Facsimile: (703) 573-9786
E-mail: heseaton@aol.com


/s/ Mark J. Andrews
STRASBURGER & PRICE, LLP
1700 K Street, N.W., Suite 640
Washington, DC  20006
Telephone: (202) 742-8601
Facsimile: (202) 742-8691
E-mail: mark.andrews@strasburger.com

*Attorneys for Petitioners*

Dated:  December 4, 2012

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

CORPORATE DISCLOSURE STATEMENT ...................................... iii

TABLE OF CONTENTS.......................................................v

TABLE OF AUTHORITIES ................................................. vii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ............................... xvii

I.  JURISDICTIONAL STATEMENT ..................................................1

II.  STATEMENT OF THE ISSUES ..................................................2

III.  STATUTES AND REGULATIONS ................................................4

IV.  STATEMENT OF THE CASE ........................................5

V.  STATEMENT OF FACTS ..........................................8

     A.     Regulatory Framework.........................................9

     B.     *Ex Parte* Development of CSA and SMS ...........................11

     C.     *NASTC* Case and Settlement ..................................14

     D.     Settlement Negated by *Ex Parte* Issuance of FMCSA Release..........15

     E.     Harmful Impacts of FMCSA Release ................................19

     F.     FMCSA Release Promotes Unvetted and Flawed Methodology........23

VI.  SUMMARY OF ARGUMENT.......................................27

VII.  STANDING................................................32

VIII. ARGUMENT ..................................................................................35

    A.    Standard of Review ...........................................................35

    B.    The FMCSA Release is a *De Facto* Legislative Rule Issued Without Required Process and is Inconsistent with Applicable Law ..................................................................................36

        1.    Statutory Requirements for an SFD Procedure Ignored...........36

        2.    APA Rulemaking Requirements Disregarded ..........................38

        3.    Regulatory Flexibility Act Requirements Ignored ...................43

    C.    The FMCSA Release Constitutes Final Agency Action that is Reviewable Under the APA ................................................45

    D.    The FMCSA Release Must Be Vacated Under the Rulemaking Standards Set Forth at 5 U.S.C. § 706(2) ............................47

        1.    Unexplained Departure From Prior Policy ..............................47

        2.    Federal Responsibility to Set Transportation Safety Standards Abdicated ...............................................................49

    E.    Resulting Prejudice to Petitioners and the Public ...............53

IX. CONCLUSION AND PRAYER FOR RELIEF..............................54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDA 1 THROUGH 3 (separately bound)

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

## <u>CASES</u>

*Advocates for Hwy. and Auto Safety v. FMCSA*,
429 F.3d 1136 (D.C. Cir. 2005)......................................................35

*Amoco Product Co. v. Watson*,
410 F.3d 722 (D.C. Cir. 2005)........................................................38

*\*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000)..........................................29, 38, 39, 40, 41

*Ass'n of Data Processing Service Org., Inc. v.*
*Bd. of Governors of Federal Reserve System*,
745 F.2d 677 (D.C. Cir. 1984)........................................................46

*\*Bennett v. Spear*,
520 U.S. 154 (1997)..................................................................40, 47

*BP Am. Prod. Co. v. Burton*,
549 U.S. 84 (2006)......................................................................38

*Bush-Quayle '92 Primary Committee v. FEC*,
104 F.3d 448 (D.C. Cir. 1997)........................................................49

*Catholic Health Initiatives v. Sebelius*,
617 F.3d 490 (D.C. Cir. 2010)........................................................41

*Chamber of Commerce v. U.S. Dep't of Labor*,
174 F.3d 206 (D.C. Cir. 1999)........................................................40

*Community Nutrition Institute v. Young*,
818 F.2d 943 (D.C. Cir. 1987)........................................................40

*\* Asterisks Indicate Authorities Chiefly Relied on*

vii

*Consolidated Rail Corp. v. Surface Transp. Bd.*,
    93 F.3d 793 (D.C. Cir. 1996)....................................................................30, 49

*Courville v. National Freight, Inc.*,
    2011 WL 2160475 (M.D. La. 2011)............................................................20

*Croplife America v. EPA*,
    329 F.3d 876 (D.C. Cir. 2003)....................................................................36

*Deerskin Trading Post, Inc. v. United Parcel Service*,
    972 F. Supp. 665 (N.D. Ga. 1997)..............................................................51

*Friberg v. Kansas City Southern Ry.*,
    267 F.3d 439 (5th Cir. 2001) ....................................................................50

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006)......................................................................46

*G&T Terminal Packaging v. Consolidated Rail Corp.*,
    830 F.2d 1230 (3rd Cir. 1987) ..................................................................50

*Gibbons v. Ogden*,
    22 U.S. 1 (1824)..........................................................................................49

*In re Air Crash Disaster Near Clarence Ctr., N.Y., on Feb. 12, 2009*,
    798 F. Supp. 2d 481 (W.D.N.Y. 2011).................................................. 50-51

*In re September 11 Litigation*,
    811 F. Supp. 2d 883 (S.D.N.Y. 2011) ........................................................51

*Independent Brokers-Dealers Ass'n v. SEC*,
    442 F.2d 132 (D.C. Cir. 1971)..............................................................45, 46

*Louisiana Public Service Comm'n v. FERC*,
    184 F.3d 892 (D.C. Cir. 1999)....................................................................49

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)....................................................................................32

*McLane v. Rich Transport, Inc.*,
  2012 WL 3996832 (E.D. Ark. 2012)............................................................20

*McNary v. Haitian Refugee Ctr., Inc.*,
  498 U.S. 479 (1991)............................................................... 35-36

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)............................................................35

*Mountain States Tel. & Tel. Co. v. FCC*,
  939 F.2d 1035 (D.C. Cir. 1991)....................................................36

*\*MST Express v. Dep't of Transportation*,
  108 F.3d 401 (D.C. Cir. 1997)..............................................10, 28, 36, 37, 41

*Nat'l Ass'n of Homebuilders v. U.S. Army Corps of Engineers*,
  417 F.3d 1272 (D.C. Cir. 2005)................................................29, 44

*\*National Association of Small Trucking Companies et al. v. FMCSA*,
  No. 10-1402,
  2011 U.S. App. LEXIS 7403 (D.C. Cir. Mar. 10, 2011).............4, 14, 15, 16,
                                                                      30, 49, 53, 54

*Nat'l Medical Enterprises, Inc. v. Shalala*,
  43 F.3d 691 (D.C. Cir. 1995)........................................................38

*National Mining Ass'n v. Jackson*,
  2011 U.S. Dist. LEXIS 3710 (D.D.C. 2011)...................................40

*Non Typical Inc. et al. v. Transglobal Logistics Group Inc. et al.*,
  2012 U.S. DIST. LEXIS 73452 (E.D. Wis. 2012) .......................................52

*Owner-Operator Independent Drivers v. FMCSA*,
  494 F.3d 188 (D.C. Cir. 2007)......................................................35

*Panhandle Eastern Pipe Line Co. v. FERC*,
  196 F.3d 1273 (D.C. Cir. 1999)....................................................49

*Parrick v. FedEx Ground*,
  2010 WL 2854314 (D. Mont. 2010)............................................................20

*Pickus v. U.S. Board of Parole*,
    507 F.2d 1107 (D.C. Cir. 1974) ....................................................40

*Rodway v. Dep't of Agriculture*,
    514 F.2d 809 (D.C. Cir. 1975) ......................................................55

*\*Safe Extensions, Inc. v. FAA*,
    509 F.3d 593 (D.C. Cir. 2007) ......................................................46

*Sangamon Valley Television Corp. v. United States*,
    269 F.2d 221 (D.C. Cir. 1959) ......................................................43

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ..............................................................30, 48

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) ......................................................32

*Southern Offshore Fishing Ass'n v. Daley*,
    55 F. Supp. 2d 1336 (M.D. Fla. 1999), *vacated on settlement*,
    2000 WL 33171005 (M.D. Fla., Dec. 7, 2000) ...............................44

*Turner v. National Transp. Safety Bd.*,
    608 F. 3d 12 (D.C. Cir. 2010) ......................................................35

*U.S. Airways, Inc. v. O'Donnell*,
    627 F.3d 1318 (10th Cir. 2010) ....................................................50

*\*U.S. Telecom Ass'n v. FCC*,
    400 F.3d 29 (D.C. Cir. 2005) ............................................29, 38, 44

*United States v. Locke*,
    529 U.S. 89 (2000) ..................................................................50

*Utility Solid Waste Activities Group v. EPA*,
    236 F.3d 749 (D.C. Cir. 2001) ......................................................42

*Vanduser v. Purdy Bros. Trucking*,
    2011 U.S. Dist. LEXIS 122039 (W.D. Va. 2011) .........................20

*W.C. v. Bowen*,
807 F.3d 1502 (9th Cir. 1987) .......................................................38

*Wisconsin Valley Improvement Co. v. FERC*,
236 F.3d 738 (D.C. Cir. 2001)........................................................48

*Witty v. Delta Air Lines, Inc.*,
366 F.3d 380 (5th Cir. 2004) ........................................................51

*Writers Guild of America, West, Inc. v. FCC*,
423 F. Supp. 1064 (C.D. Cal. 1979)..........................................45, 46

*Writers Guild v. ABC*,
609 F.2d 355 (9th Cir. 1979) .......................................................45

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. XXI ...................................................................50

U.S. CONST. art. III ..........................................................................32

## STATUTES

5 U.S.C. § 551(4) ..............................................................................38

5 U.S.C. § 553.................................................................4, 38, 43, 55

5 U.S.C. §§ 601-612..........................................................................29

5 U.S.C. § 601.............................................................................4, 43

5 U.S.C. § 601(6) ..............................................................................34

5 U.S.C. § 603.............................................................................4, 29

5 U.S.C. § 604.................................................................4, 29, 43, 44

5 U.S.C. § 604(a) ..............................................................................43

5 U.S.C. § 605................................................................................4

5 U.S.C. § 605(b) ..................................................................3, 29, 43, 44

5 U.S.C. § 608(b) ....................................................................................43

5 U.S.C. § 610 .........................................................................................43

5 U.S.C. § 611 ...........................................................................................4

5 U.S.C. § 611(a) ....................................................................................43

5 U.S.C. § 611(a)(1) ...............................................................................29

5 U.S.C. § 611(a)(4)(B) ..........................................................................44

5 U.S.C. § 702 ...........................................................................................4

5 U.S.C. § 704 .........................................................................................45

5 U.S.C. § 706 .......................................................................4, 30, 35, 53

5 U.S.C. § 706(2) ............................................................................1, 3, 47

5 U.S.C. § 706(2)(A) .........................................................................35, 40

5 U.S.C. § 706(2)(B) ...............................................................................35

5 U.S.C. § 706(2)(C) .........................................................................35, 40

5 U.S.C. § 706(2)(D) ...............................................................................35

28 U.S.C. § 2342 .......................................................................................4

28 U.S.C. § 2342(3)(A) .............................................................................1

28 U.S.C. § 2344 .......................................................................................2

49 U.S.C. § 13101 .....................................................................................4

49 U.S.C. § 13101(a)(2) ............................................................................3

49 U.S.C. § 13101(c)(2) .................................................................45

49 U.S.C. § 13102 ........................................................................4

49 U.S.C. § 13102(2) .................................................................5, 52

49 U.S.C. § 13102(8) ....................................................................5

49 U.S.C. § 13903 ........................................................................5

49 U.S.C. § 13904 ........................................................................5

49 U.S.C. § 14501 ........................................................................4

49 U.S.C. § 14501(c) ............................................................31, 51, 52

*49 U.S.C. § 31144 .......................... 1, 4, 10, 15, 29, 33, 36, 37, 38, 41, 43, 52, 53

49 U.S.C. § 31144(a) ...................................................................36

49 U.S.C. § 31144(a)(3) .............................................................36, 37

49 U.S.C. § 31144(b) ...............................................................36, 37

## **RULES**

Fed. R. App. P. 15 ........................................................................4

Fed. R. App. P. 15(a) ....................................................................1

D.C. Cir. R. 28(a)(7) .....................................................................2

## **REGULATIONS**

49 C.F.R. § 371.2(a) ....................................................................52

49 C.F.R. § 371.3(a) ....................................................................52

49 C.F.R. Part 171 .......................................................................11

49 C.F.R. Part 172...................................................................................11

49 C.F.R. Part 173...................................................................................11

49 C.F.R. Part 177...................................................................................11

49 C.F.R. Parts 350 through 399..............................................................11

49 C.F.R. Part 350...................................................................................11

49 C.F.R. Part 365...................................................................................17

49 C.F.R. Part 371.....................................................................................5

*49 C.F.R. Part 385...........4, 7, 10, 12, 13, 14, 15, 16, 17, 21, 28, 31, 33, 37, 42, 47

49 C.F.R. Part 387.....................................................................................5

## OTHER AUTHORITIES

62 Fed. Reg. 60035 (Nov. 6, 1997)..........................................................10

65 Fed. Reg. 50919 (Aug. 22, 2000) ........................................................10

67 Fed. Reg. 31978 (May 13, 2002) .........................................................10

75 Fed. Reg. 18256 (Apr. 9, 2010) .....................................................11, 12

77 Fed. Reg. 52110 (Aug. 28, 2012) ........................................................24

Annette Sandberg, *CSA 2010 and What It Means for
Commercial Motor Carriers*, 77 J. TRANSP. L. LOGIST. & POL'Y 257 (2010).........13

Cama, *Keeping Up With CSA: Scorecard Vendors Update Their
Software to Track FMCSA Changes*, Transport Topics, Oct. 22, 2012 .................24

Cornelius J. Peck, *Regulation and Control of Ex Parte
Communications with Administrative Agencies*, 76 Harv. L. Rev. 233 (1962).......43

Department of Transportation Act,
Pub.L. No. 89-670, 80 Stat. 931 (Oct. 15, 1966)......................................................9

Gregory D. Jones, *Electronic Rulemaking in the New Age of Openness*,
62 Admin. L. Rev. 1261 (2010)................................................................................55

http://www.fmcsa.dot.gov/about/news/
news-releases/2011/CSA-NASTC.aspx ...................................................................14

*False Equivalence*, Wikipedia.com,
http://en.wikipedia.org/w/index.php?title=False_equivalence&oldid=
518797540 (last visited Oct. 31, 2012).....................................................................18

https://csa.fmcsa.dot.gov/resources.aspx?locationid=115.......................................47

*Improvements to the Compliance, Safety, Accountability (CSA)*
*Motor Carrier Safety Measurement System (SMS)*,
77 Fed. Reg. 18298 (Mar. 27, 2012)........................................................................24

Mark J.Andrews, *CSA and Motor Carriers:*
*The "Intervention" Really Needed Is a Stiff Dose of*
*Administrative Due Process*," 78 J. Transp. L. Logist.
Pol'y 129 (2011) ...............................................................................14, 20, 23, 24

Miller, *DOT IG Agrees to Audit CSA After*
*Request From Congress*," Transport Topics Oct, 22, 2012....................................24

Motor Carrier Act of 1935,
Pub.L. No. 74-255, 49 Stat. 543 (Aug. 9, 1935).......................................................9

Motor Carrier Act of 1980,
Pub.L. No. 96-296, 94 Stat. 793 (July 1, 1980)........................................................9

Motor Carrier Act of 1984,
Pub.L. No. 98-554, 98 Stat. 2829 (Oct. 30, 1984)...................................................10

Motor Carrier Safety Improvement Act of 1999,
Pub.L. 106-159, 113 Stat. 1748 (Dec. 9, 1999) ...........................................9

RESTATEMENT (SECOND) OF TORTS (1965) ...............................................7

Safety Fitness Procedures, 53 Fed. Reg. 50968 (Dec. 9, 1988) ..............................10

Staggers Rail Act of 1980,
Pub.L. 96-448, 94 Stat. 1941 (1980)...................................................50

"What's New: CSA News and Information" at
www.csa.fmcsa.dot.gov ............................................................5

William E. Kenworthy, *Transportation Safety and
Insurance Law* (3d ed. 2004) ...................................................9

## **GLOSSARY OF ACRONYMS AND ABBREVIATIONS**

| | |
|---|---|
| AEMCA | Air & Expedited Motor Carriers Association |
| Agency | *See* FMCSA (*infra*) |
| APA | Administrative Procedure Act |
| ASECTT | Alliance for Safe, Efficient and Competitive Truck Transportation |
| BASIC | One of the seven "Behavior Analysis Safety Improvement Categories" in which FMCSA (*infra*) scores motor carriers under SMS (*infra*) |
| CSA | "Compliance, Safety, Accountability" program of FMCSA (*infra*) |
| FMCSA | Federal Motor Carrier Safety Administration |
| L&I | "Licensing & Insurance" database maintained by FMCSA (*supra*) |
| NASTC | National Association of Small Trucking Companies |
| RFA | Regulatory Flexibility Act |
| SAFER | "Safety & Fitness Electronic Records" database maintained by FMCSA (*supra*) |
| SFD | Safety Fitness Determination |
| SMS | Safety Measurement System |
| TEANA | The Expedite Alliance of North America |
| TLP&SA | Transportation Loss Prevention and Security Association |

# I. **JURISDICTIONAL STATEMENT**

The Petition for Review in this case was filed under Rule 15(a), Fed. R. App. P.   The publications under review were issued on May 16, 2012, by Respondents Federal Motor Carrier Safety Administration ("FCMSA" or "Agency") and the Secretary of Transportation, the Honorable Raymond H. LaHood, through Internet posting of a series of PowerPoint presentations and other advisories on FMCSA's website without any previous notice or opportunity for public comment on their substance.   These postings are referenced by title and Web address, and are collectively designated as the "FMCSA Release," in Petitioners' Certificate as to Parties, Rulings and Related Cases, *supra* at ii.   This brief will show that the Internet postings in the FMCSA Release are reviewable in this Court under 28 U.S.C. § 2342(3)(A) because they amount, in practical effect, to new and far-reaching rules, regulations and final orders of the Secretary of Transportation relating to commercial motor vehicle safety under subchapter III of Chapter 311, Title 49, United States Code.   Those Internet postings also make confusing, unexplained, statistically suspect, and procedurally defective changes in regulatory policy that must be vacated under the enumerated standards of, among other statutes, the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), for review of final agency action.   The FMCSA Release has caused Petitioners injuries that can be remedied by a favorable decision of this Court.   Standing is established

1

by 20 declarations (cited as "Decl.") that accompany this brief as Addendum 1[1] and are discussed in Parts V and VII *infra*.  Petitioners filed their Petition for Review on Monday, July 16, 2012, in compliance with the sixty-day limit provided in 28 U.S.C. § 2344.

## II.  STATEMENT OF THE ISSUES

1.     Whether the Compliance, Safety, Accountability ("CSA") program and related Safety Measurement System ("SMS") methodology as implemented and applied in the FMCSA Release –

   (a)     are unlawful under 49 U.S.C. § 31144 as a new *de facto* procedure for rating the safety of motor carriers inasmuch as they are not the product of a properly-adopted "regulation," and

   (b)     constitute a new legislative rule issued not in accordance with law and without observance of procedure required by the APA, among other laws.

2.     Whether, because the FMCSA Release is a legislative rule subject to notice and comment requirements, and affects numerous small entities, the Agency –

---

[1]   *See* D.C. Cir. R. 28(a)(7).  The paper version of Addendum 1 is contained in a separate bound volume, together with Addenda 2 and 3 which are discussed *infra*. The electronic version of Addendum 1 has been subdivided to comply with CM/ECF file size limitations.

(a)     violated the Regulatory Flexibility Act ("RFA") by not publishing a Final Regulatory Flexibility Analysis or certifying the rule under 5 U.S.C. § 605(b), and

(b)     acted inconsistently with National Transportation Policy directives concerning "competitive and efficient services" (49 U.S.C. § 13101(a)(2)) because the SMS methodology inflicts disproportionate harm on small carriers.

3.     Whether the FMCSA Release constitutes final agency action for which there is no adequate remedy; which is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; is contrary to constitutional right, power, privilege, or immunity; is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and which constitutes prejudicial error within the meaning of APA section 706(2), because, among other things –

(a)     it officially sanctions the CSA program and related SMS methodology containing numerous logical and statistical flaws that misrepresent the safety performance of motor carriers;

(b)     it portrays the flawed SMS methodology as a new and co-equal element of a carrier safety fitness determination, thereby causing harm to Petitioners and others similarly situated;

3

(c)     it represents an unexplained departure from the Agency's established policy that SMS scores are not safety ratings, as well as from the Agency's legally binding commitments under the settlement agreement it executed in *National Association of Small Trucking Companies et al. v. FMCSA*, No. 10-1402, 2011 U.S. App. LEXIS 7403 (D.C. Cir. March 10, 2011)  ("*NASTC*"); and

(d)     the Agency abdicated its statutory and constitutional obligation to provide uniform national safety fitness standards for motor carriers operating in interstate commerce, thereby exposing shippers to a patchwork of state tort-law standards for assessing the safety of carriers without definitive Agency guidance.

### III.  STATUTES AND REGULATIONS

The following have been set forth in Addendum 2 which accompanies this brief:  5 U.S.C. §§ 553, 601, 603-605, 611, 702, 706; 28 U.S.C. § 2342; 49 U.S.C. §§ 13101, 13102, 14501, 31144; 49 C.F.R. pt. 385, Subpart A, Appendices A, B; Fed. R. App. P. 15.  The paper version of Addendum 2 is bound in a separate volume along with Addenda 1 and 3.

## IV. <u>STATEMENT OF THE CASE</u>

Petitioners are individual trucking companies, individual transportation intermediaries (freight forwarders and brokers[2]), and trade associations comprised of such firms. The individual petitioners range from industry leaders with nationwide operations to small businesses offering more localized services. Petitioners seek review of Agency action that took the form of a series of public advisories posted at one of FMCSA's Internet websites on May 16, 2012. An accompanying news release described these advisories as "Resources for Safety Stakeholders."[3] The posting included the following four documents, collectively referenced in this brief as the "FMCSA Release" (*see* JA 0070-0155):

  **a.** No. FMC-CSA-12-011, entitled *CSA: A Way to Measure and Address Commercial Motor Vehicle Safety" (Industry Briefing, May 2012)* (JA 0070-0126);

---

[2] Freight forwarders assume legal responsibility for cargo but subcontract the actual hauling to carriers physically operating trucks and other transportation equipment. *See* 49 U.S.C. § 13102(8). Transportation brokers do not assume cargo liability but do "arrang[e] for" transportation, thereby helping shippers find truck capacity and helping carriers find freight to haul. *Id.* § 13102(2). As such, they resemble travel agents for freight. *See id.* The FMCSA licenses forwarders and brokers under 49 U.S.C. §§ 13903 and 13904, respectively, and regulates them to a limited degree under 49 C.F.R. pts. 387 (in Subparts C and D) and 371 (applicable to brokers only).

[3] *See* entry for May 16, 2012, under "What's New: CSA News and Information" at csa.fmcsa.dot.gov.

**b.** Unnumbered document entitled *Shipper and Insurer Briefing Addendum, May 2012 (FMCSA Data for Shippers, Brokers, and Insurers)* (JA 0127-0153);

**c.** No. FMC-CSA-12-013, entitled *Just the Facts about SMS* (JA 0154)*; and*

**d.** No. FMC-CSA-12-014, entitled *FMCSA Data – Information for Shippers, Brokers, and Insurers* (JA 0155)*.

The subject matter of the FMCSA Release relates to the process for assessing whether motor carriers (trucking and bus companies) are fit – in terms of safety management practices and performance – to operate on the Nation's highways. The law imposes on the Agency the sole responsibility to make such safety fitness determinations ("SFDs") according to standards that must be developed through full notice-and-comment rulemaking procedures. As will be seen, Petitioners challenge the FMCSA Release as unlawfully introducing new substantive rules and a new ultimate arbiter for determining the safety fitness of such carriers, which number in the hundreds of thousands across this country[4], and as doing so without adhering to required procedures.

The *new rules* implement and sanction the CSA program and the SMS methodology for the unlawful purpose of summarily changing established rules for

---

[4] The Agency estimates that there are 525,000 active motor carriers. *See* JA 0152.

6

making SFDs.  Both CSA and SMS were created without rulemaking under the APA, but now exist in a universe parallel to the Agency's published, APA-compliant regulations for making SFDs under its "safety rating" rules at 49 C.F.R. Part 385.  Taking the parallelism one step further, the FMCSA Release advises the public that SMS methodology is equal, if not superior, to the "official" safety ratings (the Agency's own terminology) as an effective indicator of a carrier's fitness.

The *new arbiter* for fitness is not the Agency with its statutory powers to credential a carrier as safe, but rather the transportation user (such as a bus passenger, a freight shipper, a freight forwarder or a transportation broker). Instead of being able to rely on FMCSA safety ratings under Part 385 as the operative SFDs, the user is now advised by the FMCSA Release to consider SMS scores at least co-equally with safety ratings in making its own "business judgments" about which carriers to utilize.  Instead of being able to rely on a preemptive federal safety credential for a motor carrier, the transportation user is subject to second-guessing of its "business judgments" under state tort-law concepts such as negligent selection and vicarious liability.[5]

---

[5]  Vicarious liability in this context refers to liability imposed in jury trials under state common law on shippers and brokers for alleged torts such as "negligent selection" of a carrier involved in a highway accident while carrying their freight. *See generally* RESTATEMENT (SECOND) OF TORTS, ch. 15 (1965).

# V.  **STATEMENT OF FACTS**

The following chronology of federal initiatives relating to motor carrier safety will demonstrate that the effect of the FMCSA Release is suddenly to foist a novel standard of care onto shippers and brokers who are called upon to select motor carriers.  This novel standard has been adopted without notice and comment – thus continuing and compounding a pattern of APA violations by the Agency throughout the history of CSA and SMS.  Once again, there has been no semblance of a typical APA rulemaking, which would have solicited comments from the public at large in advance of the Agency's action.  At most, as discussed below, the only effort at vetting of any sort has been occasional off-the-record input from selected "stakeholders."  This is an astonishing way to make new rules and establish new arbiters for determining the safety fitness of hundreds of thousands of motor carriers.  As will be shown, the new credentialing standards spawned by SMS and the FMCSA Release are confusing, ever-changing, mercurial, and capricious in their effects on carriers.  They are causing economic harm and tectonic changes in the huge national marketplace for motor carrier services.  Prevention of a spectacle like this is exactly why Congress passed the APA, the RFA and other laws requiring federal agencies to operate according to some semblance of orderly procedure.

A.      **Regulatory Framework**

In the public interest and for the purpose of promoting national uniformity, the FMCSA and predecessor agencies have long been charged with the sole responsibility to determine the safety fitness of interstate motor carriers. This federal responsibility originated in the early years of the trucking industry, with passage of the Motor Carrier Act of 1935.[6] Although the 1935 Act initially included a complex scheme of economic regulation that largely was repealed in 1980,[7] it also contained provisions relating to carrier safety and fitness[8] that were never repealed. Responsibility for administering the safety provisions of the 1935 Act was transferred to the U.S. Department of Transportation upon its creation in 1966,[9] and ultimately to FMCSA upon its creation in 1999.[10] In the intervening years, federal regulatory authority over motor carrier safety was elaborated by a series of statutes enacted in the 1980s.[11] Among these was the Motor Carrier

---

[6] Pub. L. No. 74-255, 49 Stat. 543 (1935).

[7] Motor Carrier Act of 1980, Pub. L. No. 96-296, 94 Stat. 793 (1980).

[8] The original text of the 1935 Act addressed substantive safety standards in section 204, and imposed a fitness requirement in section 207 as a prerequisite to the licensing of a motor carrier.

[9] Department of Transportation Act, Pub. L. No. 89-670, 80 Stat. 931 (1966).

[10] Motor Carrier Safety Improvement Act of 1999, Pub. L. 106-159, 113 Stat. 1748 (1999).

[11] A useful chronology and substantive outline of this federal truck safety legislation can be found in William E. Kenworthy, *Transportation Safety and Insurance Law* ch. 4 (3d ed. 2004).

Safety Act of 1984 ("1984 Act"),[12] which established a specific federal responsibility for making SFDs relating to individual motor carriers.[13]

From its outset, the 1984 Act was implemented through APA rulemaking, always culminating with publication of definitive rules in the Code of Federal Regulations.  The broad procedures for determining safety ratings were issued in 1988 and set forth in 49 C.F.R. Part 385.[14]  The specific criteria for auditing individual carriers and calculating their safety ratings were adopted through APA rulemaking in 1997,[15] after this Court struck down an attempt by a predecessor agency of FMCSA to promulgate those criteria without rulemaking.  *MST Express v. Dep't of Transp.*, 108 F.3d 401 (D.C. Cir. 1997).  Subsequent modifications to safety fitness criteria likewise were consistently adopted through rulemaking[16] -- at least until the advent of CSA/SMS and the issuance of the FMCSA Release.

The federal responsibility to issue SFDs is currently codified in 49 U.S.C. § 31144, which requires FMCSA to determine fitness under a uniform set of criteria applicable to all operators of commercial motor vehicles in all States.  In

---

[12]  Pub. L. No. 98-554, 98 Stat. 2829 (1984).

[13]  *Id.* § 215.

[14]  *See* Safety Fitness Procedures, 53 Fed. Reg. 50968 (Dec. 9, 1988).

[15]  62 Fed. Reg. 60035 (Nov. 6, 1997) (codified at 49 C.F.R. pt. 385 app. B).

[16]  *See*, *e.g.*, 65 Fed. Reg. 50919 (Aug. 22, 2000) (prohibiting operations by carriers rated UNSATISFACTORY); 67 Fed. Reg. 31978 (May 13, 2002) (establishing special SFD procedures for newly registered carriers; published as interim final rule, but with effective date set to be more than five months after close of an announced public comment period).

order to discharge this duty, FMCSA also enforces a comprehensive regulatory scheme extending to almost every detail of motor carrier safety management, licensing and commercial operations. *See* Federal Motor Carrier Safety Regulations, 49 C.F.R. pts. 350-399 (occupying over 500 single-spaced pages in their paper version). On top of that, interstate and intrastate motor carriers transporting hazardous materials must comply with 800 pages or more of federal regulations. *See* 49 C.F.R. pts. 171, 172, 173 and 177. To encourage uniform enforcement of federal motor carrier safety rules, FMCSA provides tens of millions of dollars in annual funding to state law enforcement authorities under the Motor Carrier Safety Assistance Program, codified at 49 C.F.R. Part 350.

**B.    *Ex Parte* Development of CSA and SMS**

In April 2010, the Agency announced a motor carrier safety initiative initially called "Comprehensive Safety Analysis 2010," but subsequently renamed "Compliance, Safety, Accountability" and at all times known as "CSA."[17] The new program envisioned both a new scoring system for individual carriers (SMS) and a new procedure for making SFDs. The scoring system was to consist of seven new safety metrics, called "Behavior Analysis Safety Improvement

---

[17] "Withdrawal of Proposed Improvements to the Motor Carrier Safety Status Measurement System (SafeStat) and Implementation of a New Carrier Safety Measurement System (CSMS)," 75 Fed. Reg. 18256 (April 9, 2010).

11

Categories" or "BASICs."[18]   SMS scores were to incorporate expanded law-enforcement data on citations, warnings and roadside inspections of a carrier's equipment, even those not resulting in a vehicle or a driver being placed out of service.[19]   As explained in more detail at Part V.F *infra*, however, SMS was structured so as to filter this data through arbitrarily established severity weightings for particular infractions, and to score carriers with percentile rankings rather than with any fixed or objective standards.[20]  Regarding SFDs, the Agency envisioned eventually making those fitness determinations solely on the basis of SMS data, without the on-site safety audits at carrier headquarters that currently are required under 49 C.F.R. Part 385.[21]

Although this announcement was accompanied by quasi-APA trappings such as a comment period, it presented the SMS methodology to the industry as a *fait accompli*, stated that carriers immediately would receive "a preview of their performance data" under SMS, and declared the Agency's intention to make individual carriers' SMS scores available to the public by December 2010.[22]  Thus, the Agency left no doubt that compilation and publication of the SMS data would

---

[18]   *Id*. at 18258.  The seven BASICs initially created by the SMS were: "Unsafe Driving, Fatigued Driving (Hours-of-Service), Driver Fitness, Controlled Substances and Alcohol, Vehicle Maintenance, Cargo Related, and Crash History." *Id.*  For the Agency's explanation of SMS and the BASICs, *see* JA 0138-0152.
[19]   *See* 75 Fed. Reg. at 18258.
[20]   *See*, *generally*, "Industry Briefing" portion of FMCSA Release, JA 0070-0126.
[21]   75 Fed. Reg. at 18257.
[22]   *Id.* at 18258.

proceed without APA compliance, even though it ostensibly would not use that data to make SFDs until it held a rulemaking.[23]  A former FMCSA Administrator wrote that the Agency considered rulemaking unnecessary for rollout and publication of SMS scores, because this methodology was primarily a tool for "targeting" of enforcement efforts and a graduated series of "interventions" toward the least safe members of the carrier population.[24]

Soon, however, the Agency made it clear that it viewed SMS as much more than a targeting tool.  It began denigrating the existing safety rating system under Part 385, and openly suggested that shippers should select carriers on the basis of the new SMS data.  It characterized the Part 385 safety rating system as having "longstanding limitations" that could lead to "misleading" results.  It predicted that public release of SMS data would "allow[ ] FMCSA to leverage the support of shippers, insurers, and other interested stakeholders" to make motor carriers "accountable for sustaining safe operations."  It advised a trucking audience that release of SMS data would be a "phenomenal opportunity for compliant trucking

---

[23]  *See id.* at 18257.
[24]  Annette Sandberg, *CSA 2010 and What It Means for Commercial Motor Carriers*, 77 J. TRANSP. L. LOGIST. & POL'Y 257, 258, 259 (2010).

companies to say to a shipper 'you really don't want to pick a carrier that has …
[problems] and if you … [do] your customers are going to know about it.'"[25]

## C.   *NASTC* Case and Settlement

Concerned about the Agency's apparent repurposing of SMS as a *de facto*
replacement for Part 385 without due process, and alarmed by increasingly evident
deficiencies in the SMS methodology (*see* Part V.F below), three of the petitioning
associations in the present case came before this Court to challenge SMS
methodology (and the Agency's plans to publish SMS scores for individual
carriers) in an earlier Petition for Review filed November 29, 2010.  *See NASTC*,
*supra* Part II.  That case was dismissed by stipulation of the parties after mediation
under the auspices of this Court.  The mediation produced a settlement agreement
announced on March 9, 2011.[26]

Under that agreement, the Agency made a commitment to flag all on-line
SMS data for individual motor carriers with disclaimers to the effect that SMS
scores are primarily for the Agency's internal use in "prioritizing a motor carrier

---

[25]  For specific sources of all quotations in this paragraph of the text, see Mark J.
Andrews, *CSA and Motor Carriers: The "Intervention" Really Needed Is a Stiff
Dose of Administrative Due Process*," 78 J. TRANSP. L. LOGIST. & POL'Y 129, 132
n.15 (2011) [hereinafter *CSA and Due Process*].

[26]  Addendum 3 accompanying this brief contains a Declaration of Mark J.
Andrews, to which is appended the *NASTC* settlement agreement, a related
FMCSA news release, and a screen shot of a sample disclaimer page.  The news
release is available on-line at http://www.fmcsa.dot.gov/about/news/news-
releases/2011/CSA-NASTC.aspx.  The paper version of Addendum 3 is separately
bound together with Addenda 1 and 2.

for further monitoring," are "not intended to imply any federal safety rating of the carrier pursuant to 49 USC 31144," and should not be used alone "to draw conclusions about a carrier's overall safety condition."  Addendum 3 at 000006. Also the disclaimers were to indicate that "[u]nless a motor carrier in the SMS has received an UNSATISFACTORY safety rating pursuant to 49 CFR Part 385, or has otherwise been ordered to discontinue operations by the FMCSA, it is authorized to operate on the nation's roadways." *Id.*

**D.     Settlement Negated by *Ex Parte* Issuance of FMCSA Release**

The *NASTC* settlement and related disclaimers were widely viewed, and relied upon by Petitioners and others, as a reaffirmation by FMCSA that the safety credentialing of motor carriers remained the Agency's responsibility under Part 385.  *See*, *e.g.*, Kreigh Decl. at 2; Michaelis Decl. at 3; Owen Decl. at 1-2; Elliott Decl. at 2; Jewell Decl. at 4; Hyde Decl. at 3 (Addendum 1, pp. 4, 12, 16-17, 54, 112, 199).  Any illusions as to the Agency's true position, however, were shattered on May 16, 2012, when the FMCSA Release was issued without *Federal Register* publication or any other procedural predicate, let alone prior notice and opportunity for comment.  As Petitioners will detail in the remainder of this Part V.D, the FMCSA Release openly encouraged trucking customers to utilize "public data" filtered through the same unvetted SMS methodology that the Agency previously had characterized as an internal "prioritization" tool.    More

15

significantly, it advised the public to use this data in exercising "independent judgment" concerning carrier selection, instead of relying on safety data and licensing processes developed under the Agency's published regulations in Part 385.  Thus, the FMCSA Release made specific and fundamental changes in Agency policy regarding the significance and weight the shipping public (including forwarders and transportation brokers) should ascribe to SMS data.

While the disclaimers agreed to in *NASTC* continued to appear on the SMS pages for individual carriers, the FMCSA Release sent a very different message.  The difference was glaringly apparent from the portion of the FMCSA Release entitled "*FMCSA Data for Shippers, Brokers, and Insurers (Shipper and Insurer Briefing Addendum – May 2012)*," hereafter called "Shipper Addendum."  Instead of referring to Part 385 safety ratings as the bright-line standard for determining whether a carrier is fit to operate on the Nation's highways, slide 4 of the Shipper Addendum obscured the matter with the following verbiage:

> Shippers, brokers, freight forwarders, and consumers are encouraged to exercise independent judgment about the companies with which they choose to do business.  Accordingly, FMCSA encourages the use of its public data to help make sound business judgments.  [JA 0129]

And which "public data" should be used?  Here the Shipper Addendum left no doubt about the Agency's abandonment of the *NASTC* settlement and of a uniform federal standard of care.  Thus, Slide 5 of the Shipper Addendum provided equal billing to "[t]hree primary sources of FMCSA data."  SMS was listed co-

16

equally with the Safety & Fitness Electronic Records ("SAFER") database that contains Part 385 safety ratings, and with the Licensing and Insurance ("L&I") database that reflects registrations (licenses) granted to motor carriers under 49 C.F.R. Part 365.  JA 0130.  Absent was any recognition that while Parts 385 and 365 both incorporate regulations and processes duly adopted under APA rulemaking procedures, SMS methodology has never been publicly vetted through APA-compliant processes.

Subsequent slides betrayed the fact that the Shipper Addendum was not merely neutral as between SMS and the other two databases.  To the contrary:

> A Satisfactory or Conditional rating [under SAFER] does not mean … that the public should ignore other reasonably available information about the motor carrier's operations. [Shipper Addendum, notes to slide 9; JA 0134]

> A Satisfactory rating [under SAFER] does not mean carrier is currently in compliance and operating safely [but rather] is only a snapshot based on the date of the most recent compliance review [*Id.*, slide 10; JA 0135]

> [Among the] limitations of L&I [are that it] [g]enerally only provides authority and insurance status [*Id.*, slide 11; JA 0136]

After these perfunctory dismissals of the Agency's APA-compliant databases, the remaining sixteen slides of the Shipper Addendum were devoted to extolling the alleged virtues of unvetted SMS methodology in great detail.  By way of

17

conclusion, the Shipper Addendum offered the following reaffirmation of the

Agency's doctrine of false equivalence[27] between SMS, SAFER and L&I data:

> FMCSA believes that an examination of a motor carrier's *official* safety
> rating in SAFER and their [sic] authority and insurance status on L&I,
> combined with their [sic] intervention and prioritization status in CSA's
> SMS, provide [sic] users with an informed, current, and comprehensive
> picture of a motor carrier's safety and compliance standing with FMCSA.
> FMCSA encourages the public to use the FMCSA information available to
> help make sound business judgments. [Shipper Addendum, notes to slide 28;
> JA 0153 (emphasis supplied)]

The unmistakable inference was that a shipper will *not* obtain "an informed,

current, and comprehensive picture" of its chosen carriers' safety *unless* it uses

SMS *in addition to* the APA-compliant "official" data available from the Agency.

This new standard of care for carrier selection could hardly be made more explicit.

The likely result, as discussed next, is that inconsistent state-by-state standards of

care – reflecting the tort-law doctrines of negligent selection and vicarious liability

as applied to motor carrier users by the plaintiff's bar and trial-court juries – will

replace a uniform and comprehensive federal regulatory standard developed in

accordance with the APA.

---

[27]    False equivalence has been defined as "a logical fallacy which describes a
situation where there is a logical and apparent equivalence, but when in fact there
is none." *See False Equivalence*, Wikipedia.com, *available at*
http://en.wikipedia.org/w/index.php?title=False_equivalence&oldid=518797540
(last visited October 31, 2012).

**E.     Harmful Impacts of FMCSA Release**

The Agency displayed an odd indifference to the liability exposures created

for shippers and brokers under this new standard of care:

> Questions that concern private litigation matters, such as claims for vicarious
> liability and negligent hiring, are outside the scope of FMCSA's area of
> responsibility. [Shipper Addendum, notes to slide 25; JA 0150]

Despite this empty disclaimer of responsibility, the Agency is well aware that such

"private litigation matters" have a broad public impact on the very shippers,

brokers, forwarders and insurers to which the FMCSA Release was addressed.

Shippers, brokers, carriers and their trade groups, including Petitioners here,

have been advising the Agency about the vicarious liability implications of

publishing SMS data since the inception of that program.  The materials that

FMCSA has chosen to include in its "Amended Certified Index to the

Administrative Record," (Dock. No. 1397728 (Oct. 2, 2012)), are replete with

expressions of concern about these liability implications by a broad spectrum of

parties.  These include not only the CEO of a leading national freight broker –

Petitioner Transplace, LLC ("Transplace")[28] – but also representatives of non-

petitioners such as the American Trucking Associations,[29] Schneider National (a

major full-truckload carrier and logistics provider),[30] and Jet Express (a regional

---

[28]  JA 0032, 0036.
[29]  JA 0067-0068.
[30]  JA 0012.

truckload carrier),[31] as well as other commentary appearing in trade publications such as *Fleet Owner* and *LogisticsViewpoints.com.*[32]

Vicarious liability concerns have spawned a "cottage industry" of self-styled safety consultants who are advising shippers to avoid using (directly or through brokers) any motor carrier having even one BASIC score above the Agency's thresholds for enforcement or "intervention" with individual carriers under SMS. As a result of "vendors selling monitoring system[s], large carriers seeking competitive advantage, and the Agency itself tout[ing] SMS methodology as appropriate for shipper use," 55 percent of shippers in a Morgan Stanley study have reported that they would not use carriers with even one over-threshold BASIC.[33]  Vicarious liability claims based on CSA/SMS data already are making their way through the courts, with disparate results from State to State.[34]

---

[31]  JA 0007-0008.

[32]  JA 0007-0009, JA 0015-0016.

[33]  JA 0035; *see also CSA and Due Process*, *supra* n. 25, 78 J. Transp. L. Logist. & Pol'y at 132-33 and n. 17, 19.

[34] *See*, *e.g.*, *McLane v. Rich Transport, Inc.*, No. 2:11-cv-00101 KGB, 2012 U.S. Dist. LEXIS 127778 (E.D. Ark. Sept. 7, 2012) (allowing plaintiff's expert to testify on defendant's SMS scores); *Vanduser v. Purdy Bros. Trucking Co.*, No. 7:11-cv-00317, 2011 U.S. Dist. LEXIS 122039 (W.D. Va. Oct. 21, 2011) (refusing to quash subpoena for SMS data); *Parrick v. FedEx Ground Package System, Inc.*, No. 09-95-M-DWM-JCL, 2010 U.S. Dist. LEXIS 99558 (D. Mont. Sept. 15, 2010) (denying motion to compel production of SMS data); *Courville v. Nat'l Freight, Inc.*, No. 09-CV-136 (M.D. La. June 1, 2011) (denying cross-claims for Rule 11 sanctions involving aggressive use of SMS data).

In addition to these industrywide impacts of SMS scoring as promoted by the FMCSA Release, the Declarations in Addendum 1 are replete with evidence of harm to individual parties. These parties include both motor carriers and intermediaries (brokers or forwarders).

Many of the motor carrier declarants report that at least one of their published BASIC scores is above the Agency's announced enforcement threshold, and that they have lost identifiable business as a result of customer concerns engendered by the unvetted SMS methodology summarily adopted by the Agency, even though none of these companies held an UNSATISFACTORY safety rating pursuant to Part 385. *See*, *e.g.*, Batey Decl. at 2, 3; Morrison Decl. at 2; Griffith Decl. at 2, 4; Weilheimer Decl. at 2, 3-4; Motter Decl. at 2, 3; Hyde Decl. at 4; Maniscalco Decl. at 2-3 (Addendum 1, pp. 76, 77, 91, 99, 101, 115, 116-17, 129, 130, 147, 211, 212). Several of these parties have experienced burdensome "interventions" by Agency enforcement personnel, even though they were not assigned UNSATISFACTORY safety ratings under Part 385 at the end of the process. Batey Decl. at 3; Morrison Decl. at 2; Griffith Decl. at 2; Weilheimer Decl. at 2 (Addendum 1, pp. 77, 91, 99, 115). Others have encountered difficulty in correcting faulty data that was worsening their adverse SMS scores. Owen Decl. at 7; Motter Decl. at 5 (Addendum 1, pp. 22, 132).

21

Motor carrier declarants also report problems with constantly shifting scores and with flawed SMS methodology that misrepresents their actual safety performance. Owen Decl. at 5-7; Elliott Decl. at 2-3; Lund Decl. at 4-5; Batey Decl. at 2-3; Weilheimer Decl. at 2-3; Landreth Decl. at 2; Motter Decl. at 3-6; Morse Decl. at 4-6; Maniscalco Decl. at 2-3 (Addendum 1, pp. 20-22, 54-55, 68-69, 76-77, 115-16, 127, 130-33, 147-49, 213-14). Small carriers suffer disproportionately from the quirks in this ever-changing methodology. *See* Michaelis Decl. at 3-4; Owen Decl. at 4-5; Griffith Decl. at 3; Hyde Decl. at 4 (Addendum 1 pp. 12-13, 19-20, 100, 200).

Among the broker and forwarder declarants, the most widely reported problem is the cost and administrative burden of tracking customer demands for non-use of particular carriers based on SMS scores perceived by the customer as too high. Lund Decl. at 5; Spero Decl. at 3-4, DeMatteis Decl. at 4; Sanderson Decl. at 4 (Addendum 1, pp. 69, 94-95, 105, 205). As a result, brokers and forwarders are seeing a reduction in the freight-carrying capacity available to them. *See*, *e.g.*, Spero Decl. at 4; DeMatteis Decl. at 4 (Addendum 1, pp. 95, 105).

These problems arise even though many of the carriers shunned by brokers' customers due to SMS scores actually have SATISFACTORY safety ratings under Part 385. For example, the declarant for Petitioner Transplace reports as follows:

> Transplace did an internal study of 3,097 companies in its carrier base that have safety ratings of SATISFACTORY. Fully 60 percent of these carriers

> have at least one BASIC score above the enforcement thresholds arbitrarily
> established at part of SMS, and thus are subject to being rejected by
> Transplace customers who have been deluded into thinking that SMS
> measures something meaningful.  Keeping track of which customers will not
> use particular carriers due to SMS concerns is an enormous burden for our
> company, and is not justified by any safety benefit we can identify.

Sanderson Decl. at 3-4 (Addendum 1, pp. 204-05).   See also Lund Decl. at 4

(Addendum 1, p. 68).  Given these problems, the declarant for Transplace sees no

justification for allowing SMS scores to "morph into a *de facto* safety fitness

determination."  Sanderson Decl. at 4 (Addendum 1, p. 205).

It is evident from the cited Declarations that all these harms stem directly

from the FMCSA Release, and from its promotion of SMS methodology as a new

standard of care for "business judgments" in selecting motor carriers.

**F.     FMCSA Release Promotes Unvetted and Flawed Methodology**

Had SMS scoring methodology been publicly scrutinized, finalized and

cleared for Agency use under APA, perhaps the industry could not complain about

such results.  But no such vetting has occurred.  Rather, the Agency has admitted

that the SMS methodology was devised by its staff and contractors out of the

public eye,[35] with occasional off-the-record input from selected "stakeholders."[36]

---

[35] *CSA and Due Process*, *supra* n. 25, at 133 n. 21.

[36] *See* January 10, 2012, Agency document in its Amended Certified Index to the
Administrative Record entitled "Addendum: Shippers and Insurers – Preliminary
Stakeholder Analysis," and especially the section entitled "Shippers and Insurer
Conversation Highlights" at 7-9; JA 0067-0069.  Indeed, by contrast to Petitioners'
extensive evidence of harm, *supra* Part V.E, the administrative record mustered by

Moreover, the methodology upon which the FMCSA Release advises the shipping

and broker community to rely, *supra* Part V.D, has never been finalized.  To the

contrary, it has been revised literally hundreds of times without any opportunity for

public comment except on piecemeal revisions that already had been

implemented.[37]  These are not mere technical or procedural defects.  They

constitute prejudicial error because numerous studies have shown that the SMS

---

the Agency contains remarkably puny evidence to support its action.  The record it
has certified (as amended on October 2, 2012) consists solely of the four
documents comprising the FMCSA Release itself, plus (i) the collection of
assorted *ex parte* communications in the "Stakeholder Analysis" just referenced,
(ii) a 25-slide PowerPoint presentation by Petitioner Transplace critiquing SMS as
"Not Fit for Shippers and Brokers to Use", (iii) a critique of much of the SMS
scoring methodology by the Agency-appointed Motor Carrier Safety Advisory
Committee, and (iv) excerpts from on-line postings at www.dcvelocity.com,
http://fleetowner.com, www.linkedin.com and http://logisticsviewpoints.com,
several of which recognize the vicarious liability problem discussed in Part V.E
above.  Items (ii) and (iii) are discussed in this Part V.F, and hardly can be said to
support the Agency's action.

[37] *CSA and Due Process*, *supra* n. 25, at 131-32 & n. 12.  As recounted by an
employee of a vendor of SMS monitoring services, he and his colleagues "got up
and came into work on a Monday morning" in August 2010, and "one of [their]
developers said 'Hey guys, there's a new methodology.'  They made almost a
thousand changes."  Cama, *Keeping Up With CSA: Scorecard Vendors Update
Their Software to Track FMCSA Changes*, Transport Topics, Oct. 22, 2012, at
A12-A13.  Subsequent to publication of *CSA and Due Process*, *supra* n.\_, in the
second quarter of 2011, the Agency has continued to announce further SMS
modifications, implement them immediately for affected carriers, and invite after-
the-fact comments.  *See Improvements to the Compliance, Safety, Accountability
(CSA) Motor Carrier Safety Measurement System (SMS)*, 77 Fed. Reg. 18298
(March 27, 2012) (further modified at 77 Fed. Reg. 52110 (Aug. 28, 2012)).  The
Agency's Associate Administrator for Enforcement has publicly admitted that
SMS remains a "work in progress."  Miller, *DOT IG Agrees to Audit CSA After
Request From Congress*," Transport Topics Oct, 22, 2012, at 1, 27.

methodology remains seriously flawed despite all the changes that have been made to it.

The defects of SMS as a motor carrier safety indicator are widely recognized, and are reflected in the administrative record as well as in the declarations comprising Addendum 1 to this brief.  According to a December 2011 report that FMCSA requested from its hand-picked Motor Carrier Safety Advisory Committee ("MCSAC") and has included in the Amended Certified List, the "severity weightings" assigned to individual violations under SMS methodology "were not all based on data, but rather, in part, on the opinion of experts and others with some knowledge of accident causation."  JA 0049.   The MCSAC report identified eight single-spaced pages of severity weightings which "did not comport" with MCSAC members' "experience."  JA 0049, 0052-0060.

Other observers, including the CEO of Petitioner Transplace in a lengthy PowerPoint presentation included in the Amended Certified Index to the Administrative Record ("Transplace PowerPoint"), have identified a wide variety of additional flaws in the methodology.  *See* JA 0019-0043.  These flaws include the following systemic issues that affect almost all BASICs within SMS:

> -- coverage of only a fraction of the Nation's active commercial truck fleets (Transplace PowerPoint, JA 0023-0024, 0026, 0041); *see also* Bierman Decl. at 3 (Addendum 1, p. 59).

25

-- the lack of objective standards due to percentile-based "grading on the curve" (Transplace PowerPoint, JA 0037, 0040);

-- artificial peer-grouping of unlike carriers (*id.*);

-- the Agency's limited accident data, which fails to exclude accidents that were not the carrier's fault (*id.*, JA 0038);

-- geographical anomalies resulting from almost complete reliance on disparate state enforcement systems and priorities (*id.*, JA 0039);

-- over-emphasis on paperwork violations with little direct relationship to actual highway safety (*id.*, JA 0040);

-- continuing instability and variability of SMS percentile scores, which are recalculated each month (*id.*, JA 0041); and

-- a disproportionate impact on small carriers with few data points, whose SMS scores therefore can fluctuate wildly from month to month (*id.*; *see also* JA 0046).

Defects specific to individual BASICs also have been identified.  They include the following:

-- The "Unsafe Driving" BASIC is geographically skewed because five States write more than 40 percent of all tickets and warnings for speeding.  It is no coincidence that these five States require probable cause – *i.e.*, at least issuance of warnings – before trucks can even be stopped for roadside

26

inspections.  JA 0039; *see also* Griffith Decl. at 2 and Motter Decl. at 4-5 (Addendum 1, pp. 99, 131-32).

-- The "Driver Qualification" and "Drug and Alcohol" BASICs measure too few carriers to be statistically significant.  Transplace PowerPoint, JA 0041.

-- By the Agency's own admission, a new BASIC for "Hazardous Materials" recently has been summarily introduced, once again without thoroughgoing prior public comment in a rulemaking.  JA 0116-17.

All of these flaws have been confirmed in studies by academic statisticians, which Petitioners would have been submitted in an APA rulemaking if one had been held.  *See* Owen Decl., App. D and Morse Decl., Apps. B, C, D (Addendum 1, pp. 38-52, 153-196).  While the Agency has pointed to another academic study which allegedly supports at least some aspects of SMS methodology, JA 0151, there has never been an APA-compliant rulemaking process through which these issues could be vetted.

## VI.  <u>SUMMARY OF ARGUMENT</u>

This case presents a classic example of back-door legislative rulemaking without observance of procedure required by law, including adherence to APA rulemaking requirements, the utilization of which the Motor Carrier Safety Act requires for creation of new safety fitness determination standards.  The Agency's actions also violate the Regulatory Flexibility Act's separate procedural mandates.

27

Far from being a mere guidance document, the FMCSA Release changes the world for shippers and brokers trying to select qualified motor carriers. The FMCSA Release established the SMS methodology as a safety credentialing tool which is co-equal, if not (in the Agency's view) superior, vis-à-vis the duly promulgated standards under 49 C.F.R. Part 385. Suddenly shippers and brokers are effectively being told "you're on your own" (*see*, *e.g.*, Spero Decl., App. A; DeMatteis Decl. at 5 (Addendum 1, pp. 97, 106)), instead of being able to rely on what the Agency itself acknowledges are the "official" Part 385 safety ratings as the standard of care for choosing carriers. Apparently it never occurred to FMCSA that co-equality of SMS with APA-compliant safety ratings is a legal and logical impossibility unless SMS is part of a duly adopted rule – which it is not. As this Court explained to FMCSA's predecessor agency fifteen years ago, motor carrier SFDs can only be "establish[ed] by regulation." *MST Express*, 108 F.3d at 406.

Simply stated, the FMCSA Release vastly escalates the legal consequences of the already dubious SMS methodology. Not only do over-threshold scores trigger a variety of enforcement "interventions" against carriers; now they also multiply the vicarious-liability exposures facing shippers and brokers because the Agency in effect has ordained the use of SMS as a standard of care. Under robust case law in this Circuit, these far-reaching legal consequences of the FMCSA Release elevate it from mere "guidance" to a legislative rule adopted in violation of

28

APA.  *See*, *e.g.*, *Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000).

Moreover, the APA exception for interpretative rules is inapplicable.  The FMCSA

Release does not interpret prior Agency rules establishing an SFD process under

49 U.S.C. § 31144.  Instead it brushes them off as inadequate.

Likewise, the Agency has failed to meet its legal duties under the RFA, 5

U.S.C. §§ 601-612.  Because the Agency was required to promulgate new safety

fitness determination standards via regulation, and because the FMCSA Release

constitutes a legislative rule requiring a general notice of proposed rulemaking

under the APA and the 1984 Act, it was required to comply with the RFA's

requirements.  *See U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005).

RFA requirements include either the promulgation of an initial and final regulatory

flexibility analysis detailing the economic impacts of the rule on small entities and

investigating less harmful alternatives, or a certification by the Agency that the rule

will not have a "significant economic impact on a substantial number of small

entities."  5 U.S.C. §§ 603, 604, 605(b).  The Agency's failure to either publish a

final regulatory flexibility analysis ("FRFA") or certify that a rule will not have a

substantial economic impact on small entities is actionable.  *Nat'l Ass'n of Home

Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1284 (D.C. Cir. 2005)

(citing 5 U.S.C. § 611(a)(1)).  In this case, the Agency did neither and has

therefore violated the RFA.

Wholly aside from its procedural defects, the FMCSA Release constitutes final agency action which falls short of the minimum standards for lawful and rational decisionmaking under 5 U.S.C. § 706. It foments public confusion as to whether "official" safety ratings, unvetted SMS scores or some combination of both should be used in determining the safety fitness of motor carriers. Despite the Agency's prior public acknowledgement in *NASTC* that SMS scores are not safety ratings, now SMS is suddenly extolled as the latest and greatest tool for making "business judgments" about the safety of carriers. This is not only a repudiation of the settlement agreement in *NASTC*. It is also an unexplained departure from a prior Agency position on a significant regulatory issue. Such conduct has long been recognized as the essence of arbitrary and capricious agency action. *See*, *e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80 (1943); *Consolidated Rail Corp. v. Surface Transp. Bd.*, 93 F.3d 793, 799 (D.C. Cir. 1996).

The Agency's disregard of legal standards for SFDs and rulemaking in particular, and for final agency action in general, is not a mere technical error in the context of the FMCSA Release. Widespread criticism of SMS methodology, and controversy over its validity, is apparent both from the administrative record certified by the Agency and from the declarations by Petitioners in Addendum 1. The Agency itself has tinkered with the methodology hundreds of times since the inception of CSA. It continues to do so even now – even to the point of

acknowledging that "floating" scores based on percentile rankings, which have been a foundation stone of SMS since its inception, will not be used if and when that methodology is converted into a future replacement for Part 385 safety ratings. *See* Lund Decl. at 4 (Addendum 1, p. 68). If ever there was a statistics-driven policy that would have derived benefit from full vetting under APA, SMS is it. To ordain a flawed and constantly changing SMS methodology as a standard of care for carrier selection is the epitome of arbitrary and capricious agency action.

Beyond the statutory issues discussed previously, the FMCSA Release is arbitrary, capricious and contrary to constitutional right, power, privilege and immunity because it undermines important constitutional responsibilities of the federal government. Despite a long history of primary federal responsibility for regulation of interstate commerce, the Agency now deprives shippers and brokers of the ability to rely on a definitive federal finding that an interstate motor carrier is fit for use. Instead, these transportation users are left to their own devices in trying to weigh safety ratings against SMS scores, with juries applying state tort law becoming the final arbiter of whether sound "business judgments" were exercised in selecting particular carriers. Such a result flouts judicial precedent on statutory federal preemption under 49 U.S.C. § 14501(c) and on federal field preemption in the realm of interstate carrier safety.

31

# VII. STANDING

The Petitioners in this case meet standing requirements under Article III of the United States Constitution.  Individual Petitioners have Article III standing if (1) they are suffering or will suffer an "injury in fact" that is concrete, particularized and actual or imminent, as opposed to conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; and (3) the injury will likely be redressed by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Likewise, the trade association Petitioners meet associational standing requirements if at least one member of each association would have standing to sue in its own right, the interests each association seeks to protect are germane to its purposes, and neither the claim asserted nor the relief requested requires an individual member to participate in this action.  *See Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

Addendum 1 and Part V of this brief demonstrate that both types of Petitioners have the requisite standing.  All of the declarants in Addendum 1 represent individual Petitioners, trade associations that themselves are Petitioners, and/or members of those associations.  The Petitioners represent a cross-section of motor carriers, brokers and forwarders.  All of them have suffered cognizable procedural injury from the Agency's failure to adhere to APA notice-and-comment

32

rulemaking requirements, as have the small entity Petitioners from the Agency's RFA violations.

Motor carriers (and members of motor carrier associations) have suffered economic and reputational harm by being wrongfully stigmatized under the flawed SMS methodology adopted by the Agency in violation of the APA, RFA, and the 1984 Act (49 U.S.C. § 31144). Motor carrier declarants have directly lost business by reason of receiving one or more BASIC scores exceeding the unvetted enforcement thresholds of this methodology – even though they are rated as SATISFACTORY under the Agency's "official" system of safety ratings pursuant to 49 C.F.R. Part 385. These carriers include Petitioners such as Medallion Transport and Logistics, LLC; Refrigerated Food Express, Inc. and Snowman Reliable Express, Inc. *See* Addendum 1, pp. 114-125, 144-196 and 197-201.

Broker and forwarder Petitioners likewise have suffered economic harm from the greatly diminished pool of available motor carriers stemming from the threat of new vicarious liability created by the new standard of care the Agency unlawfully adopted. More specifically, broker and forwarder Petitioners such as Carrier Services of Tennessee, Inc.; Des Moines Truck Brokers, Inc., Forward Air, Inc., and Transplace have come under shipper pressure not to use motor carriers with SATISFACTORY safety ratings but one or more over-threshold SMS scores. *See* Addendum 1, pp. 92-97, 102-108, 109-113 and 202-211. The result is to

33

shrink the carrier base available to these parties, which in turn reduces their capacity to meet customer service demands.

The economic harm suffered by both motor carriers and brokers/forwarders flows from common sources which are challenged in this case: the FMCSA Release and its promotion of the unvetted, incomplete, and capricious SMS methodology which is of dubious validity and has been subjected to widespread expert criticism. That injury is redressable by the relief sought here – *i.e.*, retraction of the FMCSA Release and an end to publication of SMS scores unless and until SMS methodology is scrutinized, validated and approved for the Agency's use in an APA-compliant rulemaking.

Finally, at least the following Petitioners are small entities within the meaning of the Regulatory Flexibility Act, 5 U.S.C. § 601(6), and therefore have standing to assert claims under that Act: Buccaneer Enterprises, LLC (Morrison Decl. at 2); Conard Transportation, Inc. (Griffith Decl. at 2); Des Moines Truck Brokers, Inc. (DeMatteis Decl. at 2); Medallion Transport & Logistics, LLC (Weilheimer Decl. at 2); Refrigerated Food Express, Inc. (Morse Decl. at 2); Snowman Reliable Express, Inc. (Hyde Decl. at 2); Triple G Express, Inc. (Maniscalco Decl. at 2). *See* Addendum 1, pp. 91, 99, 103, 115, 145, 198 and 213.

34

# VIII. ARGUMENT

## A. Standard of Review

The APA, 5 U.S.C. § 706, provides the standard of review in this case. *Owner-Operator Independent Drivers v. FMCSA*, 494 F.3d 188, 198 (D.C. Cir. 2007). "Under the APA, we must set the rule aside if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A), or if it was promulgated 'without observance of procedure required by law.'" *Id*. (citing 5 U.S.C. §§ 706(2)(A), (D)). The Court may also grant relief if the FMCSA Release is found "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(B), (C).

"An agency's rule will be found arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to difference in view or the product of agency expertise.'" *Advocates for Hwy. and Auto Safety v. FMCSA*, 429 F.3d 1136, 1144-45 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Questions of law are determined *de novo*. *Turner v. National Transp. Safety Bd.*, 608 F. 3d 12, 14 (D.C. Cir. 2010). *See also McNary v. Haitian*

35

*Refugee Ctr., Inc.*, 498 U.S. 479, 480 (1991) ("[T]he abuse-of-discretion standard does not apply to constitutional or statutory determinations, which are subject to *de novo* review."). The determination of whether a rule is legislative and thus subject to the procedural requirements of the APA is a legal question. *See Croplife America v. EPA*, 329 F.3d 876, 884 (D.C. Cir. 2003) (noting that a claim that an agency pronouncement constitutes a legislative rule "presents a purely legal question") (citing *Mountain States Tel. & Tel. Co. v. FCC*, 939 F.2d 1035, 1041 (D.C. Cir. 1991)).

**B.     The FMCSA Release is a *De Facto* Legislative Rule Issued Without Required Process and is Inconsistent with Applicable Law**

**1.     <u>Statutory Requirements for an SFD Procedure Ignored</u>**

This case is governed by the plain language of 49 U.S.C. § 31144 and by this Court's decision in *MST Express*. Under § 31144(b), the Secretary of Transportation "shall maintain *by regulation* a procedure for determining the safety fitness" of motor carriers (emphasis supplied). Under § 31144(a), the Secretary must "make … *final* safety fitness determinations readily available to the public." 49 U.S.C. § 31144(a)(3) (emphasis supplied). In *MST Express*, this Court held that § 31144 did not countenance an unpublished "safety fitness rating methodology" or "SFRM" then being used by FMCSA's predecessor agency. 108 F.3d at 406. The SFRM had set detailed guidelines by which agency inspectors could derive a safety rating from data obtained about a carrier. *Id.* at 403. Though available to

36

the public, the SFRM had not been promulgated through rulemaking.  *Id.* at 402-03.  The Government argued that the SFRM contained only "interpretive rules," exempt from notice-and-comment rulemaking.  *Id.* at 405.  This Court disagreed, holding that because the SFRM was the scheme adopted for determining motor carrier safety ratings, and because the Secretary was required to promulgate "by regulation" the method for determining carrier fitness, the SFRM should have been promulgated pursuant to notice-and-comment rulemaking.  *Id.* at 406 (citing 49 U.S.C. § 31144).

So it is here.  The FMCSA Release has elevated SMS methodology to a co-equal status with the Agency's "official" safety ratings correctly promulgated pursuant to the APA-compliant provisions of Part 385, without ever vetting SMS in a similarly APA-compliant notice-and-comment rulemaking.  Although *MST Express* may not have been implicated as long as the Agency abided by its disclaimer in *NASTC* that SMS scores were primarily internal tools and not intended as safety ratings, the FMCSA Release paints a very different picture.  The Agency has not explained and cannot explain how SMS scores can have co-equal validity with Part 385 safety ratings for purposes of carrier selection by shippers and brokers, unless SMS itself (like Part 385) is established "by regulation" under § 31144(b).  Nor has any explanation been offered of how SMS scores can be considered "final" SFDs as required by § 31144(a) when the methodology is

constantly being altered, and when SMS percentile scores for smaller carriers with fewer data points are subject to wide monthly fluctuations.

## 2.    APA Rulemaking Requirements Disregarded

The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency …." 5 U.S.C. § 551(4).   In general, APA notice and comment requirements under 5 U.S.C. § 553 apply to what are called "legislative," as compared to "interpretative," rules.  *U.S. Telecom Ass'n*, 400 F.3d at 34; *Appalachian Power*, 208 F.3d at 1020 & n.11.  A substantive, or legislative, rule requiring APA notice and comment rulemaking proceedings under 5 U.S.C. § 553 "effect[s] a change in existing policy or … affect[s] individual rights or obligations."   *W.C. v. Bowen*, 807 F.3d 1502, 1505 (9th Cir. 1987) (citations omitted); *see also Nat'l Medical Enterprises, Inc. v. Shalala*, 43 F.3d 691, 697 (D.C. Cir. 1995).  The rule also must be promulgated by a federal entity with the requisite authority to act.  *Amoco Prod. Co. v. Watson*, 410 F.3d 722, 732 (D.C. Cir. 2005), *aff'd*, *sub nom. BP Am. Prod. Co. v. Burton*, 549 U.S. 84 (2006).  The FMCSA has the statutory authority and duty to make safety fitness determinations and establish standards governing such determinations.  49 U.S.C. § 31144.

SMS, as elevated by the FMCSA Release to co-equal status with Part 385 safety ratings, operates as a legislative rule in its practical effect even though it is not the product of an APA-compliant rulemaking docket.  This, of course, is not the first time an agency has failed to follow APA notice-and-comment requirements applicable to the making of "rules."  As this Court observed in 2000, when deciding the landmark *Appalachian Power* case:

> The phenomenon we see in this case is familiar.  Congress passes a broadly worded statute.  The agency follows with regulations containing broad language, open-ended phrases, ambiguous standards and the like.  Then, as years pass, the agency issues circulars or guidance or memoranda, explaining, interpreting, defining and often expanding the commands in regulations. One guidance document may yield another and then another and so on.  Law is made, without notice and comment, without public participation, and without publication in the Federal Register or the Code of Federal Regulations.

208 F.3d at 1020.

It is difficult to imagine a more apt description of the process that unrolled in the constantly-evolving SMS methodology and led ultimately to the FMCSA Release.  To this type of process, *Appalachian Power* applied a pragmatic test for determining whether the actual result was a legislative rule rather than a mere guidance document:

> If an agency acts as if a document issued at headquarters is controlling in the field, *if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document*, if it leads private parties … to believe that it will declare permits invalid unless they comply with the terms of the

39

document, then the agency's document is for all practical purposes "binding."

*Id.* at 1021 (emphasis supplied). Most importantly, this Court looked to whether, in practice, "legal consequences [would] flow" from the agency's actions. *Id.* at 1022 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

Other decisions in this Circuit have followed a similar pragmatic path. For example, such decisions have required full APA rulemaking for parole guidelines functioning as "self imposed controls over the manner and circumstances in which the agency will exercise its plenary power,"[38] for FDA action thresholds that were treated as binding in agency documents,[39] for OSHA directives providing for jobsite inspections unless a workplace adopts a described program,[40] and for another EPA guidance document "being applied in a binding manner … even though the EPA continue[d] to receive comments about it."[41]

Under these precedents, the Agency's adoption of SMS methodology and release of SMS data exhibited many of the hallmarks of a "rule" even before issuance of the FMCSA Release. For example, SMS scores exceeding specific

---

[38] *Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1113 (D.C. Cir. 1974).

[39] *Community Nutrition Institute v. Young*, 818 F.2d 943, 947 (D.C. Cir. 1987).

[40] *Chamber of Commerce v. U.S. Dep't of Labor*, 174 F.3d 206, 210 (D.C. Cir. 1999).

[41] *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 45 (D.D.C. 2011). The Agency also has acted arbitrarily, capriciously and in excess of its statutory authority, thereby violating 5 U.S.C. §§ 706(2)(A) and (C), by creating the new standard out of whole cloth and in violation of the 1984 Act and the APA.

percentile thresholds created direct "legal consequences" for carriers in the form of enforcement "interventions" that could range from warning letters to on-site reviews to civil penalty claims.  JA 0095-0100.  But the FMCSA Release removes all doubt on this point.  By advising shippers and brokers to give SMS scores at least equal weight with "official" safety ratings, the Agency is treating SMS methodology "in the same manner as it treats a legislative rule," *Appalachian Power*, 208 F.3d at 1021, and it is creating additional "legal consequences" in the form of a new standard of care for shippers and brokers seeking to make sound "business judgments" about which carriers to use.

The Agency may argue, as did its predecessor in *MST Express*, that the FMCSA Release and the SMS methodology it extols are merely "interpretive rules."  This disguise will not work, for the simple reason that the Agency has not specified what it is supposedly interpreting.  This Court recently held that an interpretive rule must "derive a proposition from an existing document whose meaning compels or logically justifies the proposition," and that "[t]he substance of the derived proposition must flow fairly from the substance of the existing document."[42]  From what "existing document" are SMS and the FMCSA Release derived?  Clearly not from the underlying statute (49 U.S.C. § 31144), which requires that a program of final safety ratings be established by regulation but does

---

[42] *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010) (citation omitted) (internal quotation marks omitted).

not supply its "substance."   And clearly not from the published safety rating regulations at 49 CFR Part 385, because the FMCSA Release dismissed Part 385 ratings as potentially misleading "snapshots."  JA 0135.  Moreover, the oft-revised peer-grouping and weighting techniques embedded in SMS methodology do not "flow fairly from" anything in Part 385, but (as was recognized by the Agency's own hand-picked industry advisory group) were latter-day inventions of the Agency's staff and contractors behind closed doors.  JA 0149.

Judging from the documents included in the Amended Certified Index to the Administrative Record for this case, the Agency may attempt to argue that the mélange of materials posted by it and others in the blogosphere since the inception of CSA – only a fraction of which are included in that list – have provided adequate notice and opportunity for comment as to the merits *vel non* of SMS and the FMCSA release.  A sufficient answer to any such contention is that "Internet notice is not an acceptable substitute" for APA procedural protections.  *Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001). [43]  Still

---

[43] Although weighing evidence is not a function of this Court, it is worth recalling in any event that most of the materials in the Agency's Amended Certified Index to the Administrative Record (other than the FMCSA Release itself) actually are critical of SMS.  *See supra* n. 36.

less do *ex parte* meetings between Agency staff and selected "stakeholders" pass

APA muster.[44]

### 3.    Regulatory Flexibility Act Requirements Ignored

"When an agency promulgates a final rule under section 553 of this title, *after being required by that section or any other law to publish a general notice of proposed rulemaking* . . . the agency shall prepare a final regulatory flexibility analysis."    5 U.S.C. § 604(a) (emphasis supplied).    In the alternative, an agency may avoid analysis if the "head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."    *See id*. § 605(b).    "For any rule subject to this chapter, a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610 in accordance with chapter 7."    *Id.* § 611(a).

As shown above, the 1984 Act, 49 U.S.C. § 31144, requires that the methodology used to make a SFD must be adopted by regulation.    Furthermore, as shown above in Part VIII.B.2, the FMCSA Release itself amounts to a legislative rule under APA section 553.    Because FMCSA was required to issue a notice of

---

[44] Commentators on administrative law recognized as long as 50 years ago that strict controls on *ex parte* communications with regulators were required to ensure integrity in administrative proceedings.    Cornelius J. Peck, *Regulation and Control of Ex Parte Communications with Administrative Agencies*, 76 HARV. L. REV. 233 (1962).    This same concern informed a contemporaneous decision of this Court in *Sangamon Valley Television Corp. v. United States*, 269 F.2d 221 (D.C. Cir. 1959).

proposed rulemaking by both the APA and the 1984 Act, the Agency should have complied with the RFA's requirements. *U.S. Telecom Ass'n*, 400 F.3d at 42. However, the Agency neither certified the FMCSA Release under RFA section 605(b) nor prepared a final regulatory flexibility analysis under RFA section 604. This Court has set aside rulemakings when agencies have failed to meet these duties in a similar manner.[45]  *See U.S. Telecom Ass'n*, 400 F.3d at 43.  As the Agency here did neither, it violated the RFA.  *Id.*

The small entity Petitioners, listed above at Part VII, have standing to assert these claims and have been injured by the Agency's failure to adhere to the RFA's requirements. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d at 1278.  The RFA authorizes the Court to enjoin application of an offending rule to small entities, if in the public interest.  5 U.S.C. § 611(a)(4)(B); *see*, *e.g.*, *U.S. Telecom Ass'n*, 400 F.3d at 44 (enjoining FCC rule as against small entities).

Injunctive relief under RFA here would serve the public interest because the FMCSA Release is not making the public safer, just more confused about the standard of care it should use in selecting motor carriers.  Moreover, the case for RFA relief from this particular agency action is strengthened by the National

---

[45] *See also*, *e.g.*, *Southern Offshore Fishing Ass'n v. Daley*, 55 F. Supp. 2d 1336 (M.D. Fla. 1999) (enjoining further adverse regulatory action under the RFA; discussing appointment of a special master regarding agency's compliance with prior remand order involving RFA compliance), *vacated on settlement*, 2000 WL 33171005 (M.D. Fla., Dec. 7, 2000).

Transportation Policy directives concerning "competitive and efficient transportation services," 49 U.S.C. § 13101(c)(2), because the FMCSA Release is promoting SMS methodology in a way that imposes disproportionate harm on small motor carriers also qualifying as small entities under RFA.  *See* Part VII, *supra*.

## C.     The FMCSA Release Constitutes Final Agency Action that is Reviewable Under the APA

The APA provides that ". . . final agency action for which there is no other adequate remedy in a court [is] subject to judicial review."   5 U.S.C. § 704. Regardless of whether this Court finds that SMS as implemented by the FMCSA Release amounts to a rule, as it should for the reasons discussed above, it is indisputably agency action.  This Court has held that "agency action" is a much broader concept than a "rule."  *See Indep. Brokers-Dealers' Trade Ass'n v. SEC*, 442 F.2d 132, 142 (D.C. Cir. 1971).  A line of cases, including *Independent Brokers-Dealers* and others, such as *Writers Guild of America, West, Inc. v. FCC*,[46] have found justiciable agency action arising from agency efforts to mold private behavior in ways similar to FMCSA's actions here.  In *Independent Brokers*, this Court found that a series of letters from the Chairman of the Securities and Exchange Commission urging the New York Stock Exchange to change certain

_____

[46] 423 F. Supp. 1064 (C.D. Cal. 1979), *vacated on other grounds*, *sub nom. Writers Guild of Am., West, Inc. v. Am. Broadcasting Co.*, 609 F.2d 355 (9th Cir. 1979).

practices amounted to final agency action subject to review.  442 F.2d at 137-38.

In *Writers Guild*, speeches and other exhortations of the Chair of the Federal

Communications Commission were found to constitute agency action.  423 F.

Supp. at 1085-86.

More recently in *Safe Extensions, Inc. v. FAA*, 509 F.3d 593 (D.C. Cir.

2007), this Court found the FAA to have acted arbitrarily and capriciously in

"impos[ing] a strict test on [Petitioner's] product but not on other, similar

products."  *Id.* at 595, 606 (citing *Ass'n of Data Processing Service Org., Inc. v.*

*Bd. of Governors of Federal Reserve System*, 745 F.2d 677, 683-84 (D.C. Cir.

1984)).  This Court in *Safe Extensions* did not base its ruling on the procedural

propriety of this informal new test's development; rather, it held that the FAA had

undertaken final agency action that was unsupported by the very thin record upon

which it was justified.  *Id.* at 598, 604-05.  Agency action, *vel non*, is reviewable,

so long as it is final.  *See id.*

The key issue, of course, is finality.  Finality is a "threshold question" that

determines whether judicial review is available.  *Fund for Animals, Inc. v. U.S.*

*Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006).  The Supreme Court has

explained that, "[a]s a general matter, two conditions must be satisfied for agency

action to be final:  First, the action must mark the consummation of the agency's

decisionmaking process" and "the action must be one by which rights or

obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78 (quotation marks omitted).

In this case, while the Shipper Addendum has undergone at least two cosmetic revisions since it was included as one of the four parts of the FMCSA Release in May 2012,[47] the FMCSA Release's operative language, effect and import, as implemented via the flawed SMS database, has not changed. The message remains that the regulated community can no longer rely on the statutorily required and properly promulgated Part 385 SFD criteria. The FMCSA Release is thus final. Moreover, as was explained in great depth above, *supra* Part V and as elaborated further below, the practical and legal consequences of this action are tangible, wide-spread, and causing economic and other injury. Thus, the FMCSA Release constitutes final agency action subject to review by this Court.

**D. The FMCSA Release Must Be Vacated Under the Rulemaking Standards Set Forth at 5 U.S.C. § 706(2)**

**1.    Unexplained Departure From Prior Policy**

As detailed in Part V of this brief, the FMCSA Release departs radically from the Agency's previous policy – announced in connection with the *NASTC* settlement, and followed for decades by the FMCSA and its predecessor – regarding the relative weight shippers should give to Part 385 safety ratings vis-à-

---

[47]  These revisions, both re-entitled "FMCSA Data for Safety Stakeholders," were posted without prior notice on September 12 and November 26, 2012, at https://csa.fmcsa.dot.gov/resources.aspx?locationid=115 .

vis SMS data when selecting carriers.  Consistent with pre-existing APA-compliant policy, the settlement language had stated explicitly that SMS data is primarily for the Agency's internal use, that an SMS score is not a safety rating, and that carriers are eligible for use on the Nation's highways unless they have an UNSATISFACTORY safety rating or are otherwise ordered out of service.  In sharp contrast, the FMCSA Release now advises shippers that they should give SMS scores *equal if not greater weight* vis-à-vis safety ratings in order to make "business judgments" as to carrier selection.  The widespread public confusion fomented by the sudden emergence of this doctrine of false equivalence is bad enough.  *See*, *e.g.*, JA 0035-0036.  Still worse, from a legal standpoint, is the utter absence of an explanation for this sharp reversal of Agency policy.

It is a basic precept of administrative law that agencies are free to change their policies and precedent *only if* they articulate a reasonable justification for so doing.  Such a change – and indeed any agency order – "cannot be upheld merely because findings might have been made and considerations disclosed which would justify [it].  There must *be* such a responsible finding."  *Chenery Corp.*, 318 U.S. at 94 (emphasis supplied).  "An agency changing its course must supply a reasoned analysis."  *Wisconsin Valley Improvement Co. v. FERC*, 236 F.3d 738, 748 (D.C. Cir. 2001).  An agency "is not free to depart from … established precedent and thereby upset … reasonable expectations based on the preexisting practice without

an adequate explanation for doing so." *Consolidated Rail Corp.*, 93 F.3d at 799

(D.C. Cir. 1996).[48]  Here, the Agency's sudden and unexplained elevation of ever-

changing, inconsistent and unfair SMS scores to parity with safety ratings, or even

primacy over them, is not only a violation of the *NASTC* settlement agreement but

a glaring example of arbitrary and capricious agency action.

### 2. <u>Federal Responsibility to Set Transportation Safety Standards Abdicated</u>

Above and beyond the statutory requirements discussed in this brief is a

constitutional principle which the Agency has chosen to ignore: the primacy of

federal over state law in regulating interstate commerce and credentialing interstate

carriers.  This principle has been part of the bedrock of our constitutional law since

Chief Justice Marshall's opinion in *Gibbons v. Ogden*, 22 U.S. 1 (1824).  The

Agency's passive denial of responsibility for the outcome of "private litigation …

such as claims for vicarious liability and negligent hiring" (Shipper Addendum,

notes to Slide 25; JA 150) is unfathomable given the robust history of preemptive

federal authority over matters involving interstate transportation safety.  Such

passivity undermines that entire federal framework by depriving shippers and

brokers of the ability to rely on federal credentialing of motor carrier safety, and

---

[48] To similar effect, *see*, *e.g.*, *Panhandle Eastern Pipe Line Co. v. FERC,* 196 F.3d 1273, 1275 (D.C. Cir. 1999); *Louisiana Public Service Comm'n v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999); *Bush-Quayle '92 Primary Comm. v. FEC*, 104 F.3d 448, 453 (D.C. Cir. 1997).

instead imposes on them a new duty to conduct their own safety assessments of individual motor carriers.

The extent and detail of FMCSA truck safety rules – as described in Part V of this brief – is comparable to the maritime, railroad and aviation safety regulations that have been held to occupy those respective fields, thereby trumping state law.  *See*, *e.g.*, *United States v. Locke*, 529 U.S. 89, 108, 113 (2000) (recognizing field preemption in the maritime area "where there has been a history of significant federal presence"); *Friberg v. Kansas City S. R.R. Co.*, 267 F.3d 439, 443 (5th Cir. 2001) (recognizing that "regulation of railroad operations has long been a traditionally federal endeavor, to better establish uniformity in such operations and expediency in commerce"); *G&T Terminal Packaging Co. v. Consol. Rail Corp.*, 830 F.2d 1230, 1234 (3d Cir. 1987) (stating that "neither [the] text nor [the] legislative history" of the deregulatory railroad legislation known as the Staggers Rail Act of 1980 "suggests a Congressional intention to resurrect common law remedies moribund since 1907").  For decisions similarly recognizing field preemption in the area of aviation safety, *see*, *e.g.*, *U.S. Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1321 (10th Cir. 2010) (remanding only for purpose of assessing separate claim of state authority under 21ˢᵗ Amendment as to airline's service of alcoholic beverages to passengers); *In re Air Crash Disaster Near*

*Clarence Ctr., N.Y., on Feb. 12, 2009*, 798 F. Supp. 2d 481 (W.D.N.Y. 2011); *In re Sept. 11 Litig.*, 811 F. Supp. 2d 883, 885 (S.D.N.Y. 2011).

These precedents leave no room for trial-court juries to apply state tort law in second-guessing federally formulated standards of care involving interstate transportation.  It is capricious in the extreme for FMCSA to ignore these precedents and abandon the carrier credentialing field that Congress intended it to occupy.  In so doing, the Agency has created a major new rule of constitutional significance without congressional approval or APA compliance.

Wholly aside from implied preemption, Congress has extended express statutory preemption to motor freight carriers and transportation brokers. Specifically, it has prohibited States from enacting or enforcing any "law, regulation, or provision having the force and effect of law" related to those carriers' and brokers' prices, routes and services.  *See* 49 U.S.C. § 14501(c). Preempted provisions "having the force and effect of law" include substantive principles of state common law that purport to alter duties prescribed by federal transportation regulators.  *See*, *e.g.*, *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380 (5th Cir. 2004) (tort claims relating to deep vein thrombosis allegedly caused by overcrowding of passenger aircraft); *Deerskin Trading Post, Inc. v. United Parcel Serv. of Am., Inc.*, 972 F. Supp. 665 (N.D. Ga. 1997) (tort claims based on alleged fraudulent pricing of transportation services).  Indeed, § 14501(c) has been

specifically held to preempt negligence claims against brokers in cargo loss cases such as *Non Typical Inc. v. Transglobal Logistics Group Inc.*, 2012 U.S. Dist. LEXIS 73452 (E.D. Wis. May 28, 2012).

Similarly, state-law claims alleging negligent selection of motor carriers by brokers must fail under § 14501(c) because selection of carriers goes to the definitional essence of a broker's "service" in "arranging for[ ] transportation by motor carrier." 49 U.S.C. § 13102(2). A broker's *only* carrier-selection duties under published, APA-compliant federal regulations are to use an "authorized motor carrier" and to document such use by keeping a record of the carrier's FMCSA "registration number." 49 C.F.R. §§ 371.2(a), 371.3(a). It is not for local juries, egged on by the plaintiff's trial bar, to augment those duties by requiring brokers to use only those authorized carriers with certain scores under unvetted SMS methodology.

The Agency's complained-of actions, in particular its attempt to retract the federally preemptive effect of its own final safety fitness determinations, have the effect of nullifying the purpose of the federal statutes it is required to uphold. The FMCSA should be enforcing, or at least recognizing, the preemptive effect of its own motor carrier regulations. By instead undermining preemption, the Agency is depriving brokers and their customers of the right to select carriers in reliance on its "final" SFDs that should be paramount under 49 U.S.C. §§ 31144 and 14501(c).

52

**E.     Resulting Prejudice to Petitioners and the Public**

It is true, of course, that a reviewing court under 5 U.S.C. § 706 must take "due account … of the rule of prejudicial error" in order to avoid reversing agency action for technical faults that harm no one.  Here, however, there is massive and growing evidence that SMS methodology is riddled with defects that are far more than technical, and are harmful to large segments of the regulated community.  *See supra* Part V, and record citations there provided.  In the face of this evidence, the FMCSA Release is devoid of "reasoned analysis" that would support ordaining SMS scores as a standard of care.

Thus, the Agency's insistence on publishing unvetted SMS scores, and on touting them as fit for public use in the FMCSA Release, is prejudicial error because it induces shippers and brokers to rely on dubious data.  SMS data does not meet the SFD standards of 49 U.S.C. § 31144, because it is neither "final" nor the product of a "regulation."   Nor, as explained above, does it meet APA rulemaking standards.  Considering the statutory duties and obligations of the Agency, the intended preemptive effect of its safety fitness determinations, the congressional mandates in the National Transportation Policy and the Agency's settlement agreement in *NASTC*, the Court properly must conclude that the FMCSA Release under review is not some minor act of regulatory guidance which is of little consequence and within the ambit of administrative discretion.  Instead,

53

the Court must recognize the prejudice that the FMCSA Release and its underlying

SMS methodology are causing.  They represent a fundamental repudiation of the

Agency's statutory responsibility that imposes broad, new and uncertain duties on

the shipping public, unfairly prejudices the ability of small carriers to compete in

an open and free market, and raises to the status of regulation an unvetted

methodology which even the Agency acknowledges is only a "work in progress" in

its current state.  *Supra* n. 37.

### IX.  CONCLUSION AND PRAYER FOR RELIEF

For all the reasons stated in this brief, Petitioners ask the Court to vacate the

FMCSA Release, and to remand it with instructions for the Agency not to publish

SMS scores, nor treat SMS methodology as co-equal with SFDs, until after a

rulemaking in full compliance with APA.  There is no warrant for further

"rulemaking lite" processes, in which unstructured trawling through the

blogosphere is casually blended with ersatz "comment" periods addressing

piecemeal SMS modifications already implemented by the Agency.  While

electronic means of publishing notice and collecting comments of course are

permissible, the rulemaking genuinely must "provide interested persons" with full

"opportunity to influence final rules" by commenting on all aspects of SMS

methodology.[49]   In turn, the Agency must "respond in a reasoned manner to the comments received, explain how the agency resolved any significant problems raised by the comments, and show how that resolution led the agency to the ultimate rule."[50]   This structural process, long required by the APA, the RFA and the 1984 Act, are designed to preclude the flawed, illegitimate and injurious regulatory regime that Respondents have created here.

Wherefore, Petitioners pray that this Court issue its Order:

1.    Declaring that the FMCSA Release is arbitrary, capricious, inconsistent with law and required procedure, in excess of statutory authority, and contrary to constitutional right.

2.    Enjoining the Agency from advising the public to rely on the CSA and SMS for the purposes of making safety fitness determinations, both as to small entities under RFA and more generally.

3.    Enjoining the Agency from making SMS data available to the public until a new, lawful safety fitness determination regulation is promulgated.

4.    Remanding the FMCSA Release to the Agency for further notice and opportunity to comment.

---

[49] *See* Gregory D. Jones, Comment, *Electronic Rulemaking in the New Age of Openness*, 62 ADMIN. L. REV. 1261, 1273 (2010) (quoting APA provisions at 5 U.S.C. § 553).

[50] *Rodway v. U.S. Dep't of Agric.*, 514 F.2d 809, 817 (D.C. Cir. 1975).

5.    Remanding the FMCSA Release for an appropriate Regulatory Flexibility Act analysis.

6.    Granting such other relief as the Court may deem necessary or appropriate, including attorneys fees and costs.

Respectfully submitted,

*/s/ David E. Frulla*
Shaun M. Gehan
KELLEY DRYE & WARREN LLP
Washington Harbour, Suite 400
3050 K Street, N.W.
Washington, DC  20007-5108
Telephone: (202) 342-8400
Facsimile: (202) 342-8451
E-mail: dfrulla@kelleydrye.com

Henry E. Seaton
SEATON & HUSK, L.P.
2240 Gallows Road
Vienna, VA  22182
Telephone: (703) 573-0700
Facsimile: (703) 573-9786
E-mail: heseaton@aol.com

Mark J. Andrews
STRASBURGER & PRICE, LLP
1700 K Street, N.W., Suite 640
Washington, DC 20006-3817
Telephone: (202) 742-8601
Facsimile: (202) 742-8691
E-mail: mark.andrews@strasburger.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*13,188*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

    [     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>December 4, 2012</u>          <u>/s/ David E. Frulla</u>
                                        *Counsel for Petitioners*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 4th day of December, 2012, I caused this Brief of

Petitioners to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

Paul M. Geier                                    Matthew M. Collette
Joy Park                                         Jeffrey A. Clair
Peter J. Plocki                                  U.S. DEPARTMENT OF JUSTICE
U.S. DEPARTMENT OF TRANSPORTATION                950 Pennsylvania Avenue, NW
1200 New Jersey Avenue, SE                       Washington, DC  20530
Washington, DC  20590                            (202) 514-2000
(202) 366-4731

*Counsel for Respondents*                        *Counsel for Respondents*

I further certify that I caused the required copies of the Brief of Petitioners to

be hand filed with the Clerk of the Court.

/s/ David E. Frulla
*Counsel for Petitioners*