RECORD NO. 12-1305

**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

*In The*

# United States Court of Appeals

### For The District of Columbia Circuit

**ALLIANCE FOR SAFE, EFFICIENT AND COMPETITIVE TRUCK TRANSPORTATION;
AIR & EXPEDITED MOTOR CARRIERS ASSOCIATION; THE EXPEDITE
ASSOCIATION OF NORTH AMERICA; NATIONAL ASSOCIATION OF SMALL
TRUCKING COMPANIES; TRANSPORTATION LOSS PREVENTION AND SECURITY
ASSOCIATION; ALLEN LUND COMPANY, INC.; BOLT EXPRESS, LLC;
BP EXPRESS, INC.; CARRIER SERVICES OF TENNESSEE, INC.; CONARD
TRANSPORTATION, INC.; DES MOINES TRUCK BROKERS, INC.;
FORWARD AIR, INC.; MEDALLION TRANSPORT & LOGISTICS, LLC;
REFRIGERATED FOOD EXPRESS, INC.; SNOWMAN RELIABLE EXPRESS, INC.;
TRANSPLACE, LLC; TRIPLE G EXPRESS, INC.,**

*Petitioners*,

v.

**FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION;
RAYMOND L. LAHOOD, in his official capacity as Secretary of Transportation,**

*Respondents*.

**ON PETITION FOR REVIEW FROM THE
FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION**

_____

### BRIEF OF *AMICUS CURIAE*
### NATIONAL CONFECTIONERS' LOGISTICS COUNCIL, INC.

_____

**Gerald K. Gimmel**
GIMMEL, WEIMAN, ERSEK, BLOMBERG & LEWIS, PA
**4 Professional Drive, Suite 145**
**Gaithersburg, Maryland  20879**
**301-840-8565**

*Counsel for Amicus Curiae
  National Confectioners' Logistics Council, Inc.*

**THE LEX GROUP**DC ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C.  20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

## Certificate as to Parties, Rulings, and Related Cases

1.  **Parties and Amici.** The Petitioners in this case are as follows:

>   Alliance for Safe, Efficient and Competitive Truck Transportation
>   Air & Expedited Motor Carriers Association ("AEMCA")
>   The Expedite Association of North America ("TEANA")
>   National Association of Small Trucking Companies ("NASTC")
>   Transportation Loss Prevention and Security Association
>   Allen Lund Company, Inc.
>   Bolt Express, LLC
>   BP Express, Inc.
>   Carrier Services of Tennessee, Inc.
>   Conard Transportation, Inc.
>   Des Moines Truck Brokers, Inc.
>   Forward Air, Inc.
>   Medallion Transport & Logistics, LLC
>   Refrigerated Food Express, Inc.
>   Snowman Reliable Express, Inc.
>   Transplace, LLC
>   Triple G Express, Inc.

The Respondents are the Federal Motor Carrier Safety Administration and The Honorable Raymond L. LaHood in his official capacity as Secretary of Transportation. Undersigned counsel at this writing is aware of one other prospective amici, it is also in support of Petitioners: the Airforwarders Association. Because the agency action at issue here was published without any prior notice or opportunity for public comment, Petitioners are unable to list any parties who participated in proceedings below.

**2. Rulings under Review.** The rules, regulations and/or agency action at issue before this Court include the following documents released by Respondents through publication on May 16, 2012, at one of their websites, csa.fmcsa.dot.gov:

**a.** No. FMC-CSA-12-011, entitled *CSA: A Way to Measure and Address Commercial Motor Vehicle Safety" (Industry Briefing, May 2012)* (Joint Appendix ("JA") 0070-0126);

**b.** Unnumbered document entitled *Shipper and Insurer Briefing Addendum, May 2012 (FMCSA Data for Shippers, Brokers, and Insurers) )* (JA 0127-0153);

**c.** No. FMC-CSA-12-013, entitled *Just the Facts about SMS)* (JA 0154), and

**d.** No. FMC-CSA-12-014, entitled *FMCSA Data – Information for Shippers, Brokers, and Insurers)* (JA 0155).

Each of the foregoing documents (collectively referred to as the "FMCSA Release") was attached to the Petition For Review filed with this Court on Monday, July 16, 2012.

**3. Related Cases.** The instant case has not previously been before this Court or any other court. There is no related case pending in this Court or any other court of which undersigned counsel are aware. Issues raised in this case do relate, however, to claims addressed in *National Association of Small Trucking*

*Companies v. FMCSA*, No. 10-1402, 2011 U.S. App. LEXIS 7403 (D.C. Cir.

March 10, 2011) ("*NASTC*"), which was concluded by means of a settlement

agreement reached among the parties through mediation under the auspices of this

Court. In Petitioners' view, the FMCSA Release (among its other legal defects)

violates that settlement agreement. In addition to Petitioner NASTC and

Respondent FMCSA, Petitioners AEMCA and TEANA also were parties to that

case.

Dated: <u>December 11, 2012</u>          Respectfully submitted,

<u>/s/ Gerald K. Gimmel</u>
Gerald K. Gimmel, Esquire
Gimmel, Weiman, Ersek, Blomberg
& Lewis, PA
4 Professional Drive, Suite 145
Gaithersburg, MD  20879
Tel: 301-840-8565
Fax: 301-590-9784
ggimmel@gweblaw.com

*Counsel for the National Confectioners'*
*Logistics Council, Inc.*

## Corporate Disclosure Statement

Pursuant to Fed. R. App. P. 26.1 and D.C. Cir. Rule 26.1, movant

National Confectioners' Logistics Council, Inc. ("NCLC") states that it is a non-

profit national trade association. NCLC represents the interests of the logistics

personnel of confectionery manufacturers and importers and of the motor carrier

companies they utilize before regulatory agencies and legislative bodies. NCLC

does not have any parent corporations, and no publicly held company owns any

stock in NCLC.

Dated: December 11, 2012              Respectfully submitted,

                                      /s/ Gerald K. Gimmel
                                      Gerald K. Gimmel, Esquire
                                      Gimmel, Weiman, Ersek, Blomberg
                                      & Lewis, PA
                                      4 Professional Drive, Suite 145
                                      Gaithersburg, MD  20879
                                      Tel: 301-840-8565
                                      Fax: 301-590-9784
                                      ggimmel@gweblaw.com

                                      *Counsel for the National Confectioners'*
                                      *Logistics Council, Inc.*

## Table of Contents

**Page**

Table of Authorities ............................................................. iii

I.      Interest of NCLC ......................................................2

II.     Statutes and Regulations.........................................7

III.    Legal Argument .......................................................7

        (a)    Nationwide Distribution of Confectionary Requires Uniform
               Enforcement of Motor Carrier Safety Standards ................................7

        (b)    The Purpose of Federal Safety Regulations and Standards is to
               Promote Interstate Commerce and Protect Shippers as well as
               the Traveling Public .......................................................8

        (c)    The Preemptive Effect of the FMCSA's Ultimate Safety Fitness
               Determination is Clear .......................................................8

        (d)    Internet Publication of May 16 Release Is a New De Facto Rule
               Adopted Without Due Process ...........................................9

        (e)    FMCSA Cannot Arbitrarily and Capriciously Negate the
               Preemptive Effect of Federal Statute and Abdicate Its Safety
               Fitness Duties under Existing Regulations .........................................10

        (f)    Federal Statutes Require the FMCSA to Encourage
               Competition, Efficiency and Small Businesses .................................12

        (g)    FMCSA's Effort to Deputize Shippers to "Raise the Safety
               Bar" Under Peril of State Law Liability Imposes New Rules
               and Duties on Shippers Contrary to Federal Statute ..........................14

        (h)    Shippers are not Equipped to Make Safety Fitness
               Determinations ......................................................15

(i)    The Agency Lacks Authority to Renounce the Preemptive Effect of its Congressionally Mandated Safety Fitness Determination .......................................................................................15

IV.    Relief Sought .................................................................................17

Certificate of Compliance

Certificate of Filing and Service

## Table of Authorities

**Page(s)**

### Cases

*Adams Express Co. v. Croninger*,
  226 U.S. 491 (1913)...................................................................................13

*Charleston & Western Carolina Ry. Co. v. Varnville Furniture Co.*,
  237 U.S. 597 (1915)...................................................................................14

*\*NASTC et al. v. FMCSA*,
  No. 10-1402,
  2011 U.S. App. LEXIS 7403 (D.C. Cir. Mar. 10, 2011).....................3, 12, 17

*Rini v. United Van Lines*,
  104 F.3d 502 (1st Cir. 1997) .........................................................................13

*Southern Express v. Pastime Amusement Co.*,
  289 U.S. 28 (1936)................................................................................. 13-14

### Statutes

49 U.S.C. § 13101 ...................................................................................12

49 U.S.C. § 14501(c) ................................................................................9

49 U.S.C. § 14706...................................................................................13

*49 U.S.C. § 31144...............................................................................2, 8, 12

*49 U.S.C. § 31144(b) ................................................................................4

*Asterisks Indicate Authorities Chiefly Relied on*

iii

## **Regulation**

*49 C.F.R. § 385 ...................................................................................................2, 11

## **Rule**

Fed. R. App. P. 29(c)(5)............................................................................................2

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| ALLIANCE FOR SAFE, EFFICIENT AND COMPETITIVE TRUCK TRANSPORTATION; AIR & EXPEDITED MOTOR CARRIERS ASSOCIATION; THE EXPEDITE ASSOCIATION OF NORTH AMERICA; NATIONAL ASSOCIATION OF SMALL TRUCKING COMPANIES; TRANSPORTATION LOSS PREVENTION AND SECURITY ASSOCIATION; ALLEN LUND COMPANY, INC.; BOLT EXPRESS, LLC; BP EXPRESS, INC.; CARRIER SERVICES OF TENNESSEE, INC.; CONARD TRANSPORTATION, INC.; DES MOINES TRUCK BROKERS, INC.; FORWARD AIR, INC.; MEDALLION TRANSPORT & LOGISTICS, LLC; REFRIGERATED FOOD EXPRESS, INC.; SNOWMAN RELIABLE EXPRESS, INC.; TRANSPLACE, LLC; and TRIPLE G EXPRESS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 12-1305 |
| Petitioners, | ) | |
| - vs. - | ) ) | |
| FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION and THE HONORABLE RAY LAHOOD, in his official capacity as SECRETARY OF TRANSPORTATION, | ) ) ) ) ) | |
| Respondents._____ | ) ) | |

## *AMICUS CURIAE* BRIEF ON BEHALF OF
## NATIONAL CONFECTIONERS' LOGISTICS COUNCIL, INC.
## IN SUPPORT OF RELIEF SOUGHT BY PETITIONERS

1

COMES NOW the National Confectioners' Logistics Council, Inc. ("NCLC"), by and through Counsel as authorized by its Members at a membership meeting, and files this, its *Amicus Curiae* Brief in support of petitioners in the above described proceeding.

## I.  Interest of NCLC[1]

NCLC is a fifty-four (54) member trade organization composed of (i) manufacturers of candy and confectionary items which are distributed nationwide and (ii) interstate motor carriers and brokers which are subject to federal regulations and service the confectionary industry.  NCLC shipper members distribute candy and confectionary related items requiring refrigerated or protected service in truckload and less-than-truckload quantities in interstate commerce between points in the United States, utilizing for-hire motor carriers subject to safety regulations and statutes promulgated and enforced by the Federal Motor Carrier Safety Administration ("FMCSA").

Under current statutory provisions at 49 U.S.C. § 31144 (and current safety regulations at 49 C.F.R. Part 385), NCLC shipper members are free to select licensed and authorized carriers based upon routes, rates and service, while relying

---

[1] Pursuant to Rule 29(c)(5), Fed. R. App. P., undersigned counsel certifies that a first draft of this brief was co-authored in part by two of the attorneys for Petitioners (Mark J. Andrews and Henry E. Seaton), but that no person other than NCLC, its members or its counsel contributed money intended to fund preparing or submitting this brief.

upon the FMCSA to discharge its duty to determine which carriers are safe or unsafe to operate on the nation's roadways. Traditionally, NCLC members and other interstate shippers have had no safety credentialing obligations and as the intended beneficiary of the FMCSA's ultimate safety fitness determinations, have been freed from the vicissitudes of potentially conflicting state law involving tort liability for negligent selection when hiring a vendor certified as safe to operate on the nation's roadways in all 50 states by the FMCSA.

Although to NCLC's knowledge, none of its members have been sued to date for vicarious liability or negligent selection of carriers under state law concepts, its members have been repeatedly advised of the efforts of plaintiffs' bar to embroil shippers in accident liability cases because the authorized carrier is merely transporting a shipper's product at the time of an accident. As a result, when the FMCSA proposed to publish CSA 2010/SMS percentile rankings for unspecified use by shippers and brokers without any disclaimer, its action was quickly met with a legal challenge and resolved by settlement in *National Association of Small Trucking Companies et al. v. Federal Motor Carrier Safety Administration*, filed in the United States Court of Appeals for the District of Columbia Circuit as Case No. 10-1402.

Therein, the FMCSA affirmed its statutory safety credentialing duties, and directed the shipping public to its Licensing & Insurance web page where NCLC

3

shipper members could rely upon publication of the Agency's ultimate safety

fitness determinations for individual carriers (SFDs) in accordance with past

practices and the federal statute.  See 49 U.S.C. § 31144(b).

Since the Spring of 2011, contrary to the settlement, the Agency has

continued to tout SMS methodology, which includes percentile rankings in

statistical categories known as "BASICs," as a useful and needed tool for the

shipping public to use.  The percentile ranking of carriers has been roundly

criticized throughout the industry.  The methodology behind the published

percentile rankings of carriers has been frequently revised, has not been submitted

for rulemaking, and thus cannot be used by the Agency in making SFDs.  Indeed,

as recently as Wednesday, December 5, 2012, the Agency posted a new

introductory page (that must be clicked through by anyone accessing on-line SMS

data) which details numerous recent changes in SMS methodology – all made

without benefit of rulemaking.  A copy of that page accompanies this brief as

*Addendum 1*.

Even so, merchants of monitoring services and those seeking competitive

advantage have continued to suggest that shippers must second guess the Agency's

ultimate safety fitness determinations using competitive percentile rankings under

the constantly-changing SMS methodology, or face being sued under state law.  As

a result, a shipper survey released in December, 2012 – which collected responses

4

from "dozens of shippers" controlling "tens of billions of dollars" worth of
freight – shows that nearly two-thirds of shippers believe the threat of vicarious
liability has increased due to CSA.  See Section 5, *Shipper Survey Findings*, in
"Compliance, Safety, Accountability: Evaluating a New Safety Measurement
System and its Implications," prepared by the American Transportation Research
Institute, attached hereto as *Addendum 2*.

     As pointed out by petitioners, the Agency has been made well aware of the
conundrum which publication of SMS percentile rankings creates for shippers and
brokers.  If shippers must second guess the Agency's ultimate safety fitness
determination or be sued under state law causes of action, they lose all benefits of
federal regulation and must face two equally unattractive results.  A shipper can
use the Agency's arbitrary monitoring thresholds and lose 50% of its available
capacity (53,000 out of 100,000 ranked carriers are over the threshold in at least
one BASIC) or a shipper can use some different threshold and run the risk of being
sued.

     To distribute candy and confectionary to every "mom and pop" grocery
store, as well as to chain merchandisers throughout the country, requires regularly
scheduled deliveries, long term contracts with service providers, and the ability to
meet high seasonal shipping demands prior to Halloween, Christmas and Easter.
Unlike a safety fitness determination, which is based upon stand-alone objective

5

criteria and published federal regulations, SMS percentile rankings currently grade carriers with arbitrary percentile thresholds that stigmatize and effectively disqualify carriers ranked above percentiles varying from 60% to 80% in each of the 5 published BASICs.  These percentile rankings change monthly, and small carriers' scores can fluctuate wildly based upon individual infractions.

NCLC submits  that there is no practical way for its shipper members to accept safety credentialing duties, utilizing constantly changing SMS scores and methodology in whole or in part, without destroying the current competitive and efficient motor carrier services upon which those shippers have come to rely or drastically curtailing its use of carriers which the Agency under existing laws and statutes has certified as fit to operate.

Carrier members of NCLC with scores over the arbitrary threshold in one or more of the "BASICs" are still valued service providers which are required to invest over $40,000 in each specialized refrigerated trailer used to serve the confectionary industry.  They have not been found unfit to operate on the nation's highways.  However, they are threatened with the possible loss of the patronage of NCLC shipper members because they were stigmatized as a result of use of SMS methodology.

## II.  Statutes and Regulations

The relevant statutes and regulations have been set forth in the Brief of Petitioners.

## III. Legal Argument

### (a)  Nationwide Distribution of Confectionary Requires Uniform Enforcement of Motor Carrier Safety Standards

With the passage of the Motor Carrier Act of 1935 through proper exercise of the Commerce Clause of the United States Constitution, Congress expressed a clear intent to establish minimum safety credentialing standards which would apply in all 50 States with respect to interstate commerce.  Shipper members of NCLC distribute candy and confectionary in all 50 States and use primarily interstate for-hire motor carriers to make delivery.  NCLC shipper members use a combination of truckload carriers from point of manufacture to distribution centers and regional carriers to peddle confectionary to ultimate retailers.  As nationwide shippers, NCLC shippers are consumers of interstate services and should not have to school themselves in the conflicting legal standards for negligent selection liability imposed by 50 different States through which their products are transported.

**(b)  The Purpose of Federal Safety Regulations and Standards is to Promote
<u>Interstate Commerce and Protect Shippers as well as the Traveling Public</u>**

NCLC submits that Congress has evidenced a clear intent to use its

preemptive power to occupy the field of motor carrier safety to the exclusion of

conflicting state laws.  49 U.S.C. § 31144 requires that Agency make a safety

fitness determination for each carrier which applies in all States and that the final

SFD be made public.  In addition, under the Motor Carrier Safety Assistance

Program ("MCSAP"), state officials are required to cooperate with the FMCSA to

enforce federal uniform safety regulations relating to commercial motor vehicles.

The FMCSA was created not to promote highway safety at any cost to the

shipping and traveling public, but to do two things uniformly, fairly and with due

process: (1) enforce minimum safety rules to determine which carriers are safe to

operate on the nation's roadways, and (2) if a carrier is found unsafe, to take it off

the road.  Under the scheme of federal regulations, the FMCSA determines not

only who is safe but also the minimum financial surety which each carrier must

maintain for the public's protection.

**(c) The Preemptive Effect of the FMCSA's Ultimate
<u>Safety Fitness Determination is Clear</u>**

The primary purpose of regulation of any industry is to protect the public

and the consumer.  Shippers and brokers are consumers of motor carrier services,

and the proper exercise of administrative expertise is to establish a safe and secure

8

marketplace in which the consumer can rely upon the government to do its job

without fear of unnecessary liability.  That a consumer of regulated goods or

services would bear the legal responsibility of second guessing the expert's

decision under fear of unlimited tort liability is unheard of and unfair.

Although interstate trucking regulation originally was grounded in public

utility law relating to price controls and limitations on market entry, deregulation

of pricing and entry did not change the preemptive effect of the federal safety

fitness determination.  The FMCSA inherited, without substantial modification, the

basic safety statutes enforced by the Interstate Commerce Commission (ICC)

before it.  In deregulating routes, rates and services, Congress made clear that it

was not abandoning the conflict and field preemption of all state laws with respect

to interstate truck transportation.  In fact, it passed a broadly worded express

preemption statute to make this clear.  See 49 U.S.C. § 14501(c).

### (d) Internet Publication of May 16 Release<br>Is a New De Facto Rule Adopted Without Due Process

The FMCSA, as an administrative agency acting within the scope of its

delegated statutory authority, clearly can promulgate new rules in accordance with

the Administrative Procedure Act (APA).  It cannot, however, change statutes or

abdicate its statutory duties and responsibilities.

Yet on May 16th, 2012, the Agency announced that its own safety fitness

determination as mandated by statute was not in full force and effect, because the

value of the determination diminishes over time because the determination was only a "snapshot" of a carrier's operational safety.  For the first time the FMCSA publicly abdicated the preemptive effect of its own SFD by telling confectionary manufacturers and other shippers that they must assess unspecified "safety risks," and by advising them of the Agency's view that "private litigation matters, such as claims for vicarious liability and negligent hiring, are outside the scope of FMCSA's area of responsibility."

Thus the Agency, on its own motion, and without congressional approval, has repudiated the preemptive effect of its own safety fitness determination and has abdicated its duty to a frightened shipping public.  If the Agency's final safety fitness determination is not the law of the land applicable in all 50 States, what is? The Agency's release begs that question.  A recent on-line posting by Tranzact Technologies (a vendor of SMS monitoring services) says it all: "Shippers, You're On Your Own!"  See Appendix A to Declaration of James DeMatteis attached to Petitioners' opening brief in this case.

### (e)  FMCSA Cannot Arbitrarily and Capriciously Negate the Preemptive Effect of Federal Statute and Abdicate <u>Its Safety Fitness Duties under Existing Regulations</u>

The Internet is a powerful tool which has been used effectively by the FMCSA to tout SMS methodology for the past two years as a virtual *fait accompli.* Petitioners' opening brief shows how the Agency, working with preferred

"stakeholders" and without the protections afforded under the APA, has promoted through premature publication an unvetted percentile ranking of carriers as a new rule for determining carrier safety fitness to be enforced by an unwillingly deputized public.

NCLC submits that the Agency cannot replace the objective compliance review required by 49 C.F.R. § 385 with a new rule which grades carriers on a percentile curve without compliance with the Administrative Procedure Act, nor can the Agency abdicate its safety fitness duties required by federal statute to a frightened shipping public without statutory warrant.

In sum, the Agency's May 16th release is a repudiation of its settlement in *NASTC et al. v. FMCSA*, and likewise is a repudiation of its statutory duty to make an objective safety fitness determination of each motor carrier and to publish that finding for the shipper's use and benefit. The FMCSA is not authorized by Congress to enforce a rule which grades carrier safety fitness on a curve and stigmatizes a carrier above an artificial percentile as unfit for use by the shipping public, regardless of that carrier's actual objective performance.

Clearly, Congress intended to encourage interstate commerce and assigned to the FMCSA the duty to enforce uniform safety standards on all carriers regardless of size, of the States in which they operate, or of the artificial peer group in which they are "grouped for further monitoring" under SMS. Continued

11

publication of SMS percentile rankings for shipper and broker use in light of the

Agency's May 16th release is arbitrary and capricious and must be overturned.

Efforts by the Agency to continually modify its website advice after the May 16

release – as demonstrated in Petitioners' opening brief and in *Addendum 1* to this

brief – show that nothing short of the Court's admonishment to the Agency to

adhere strictly to the settlement in *NASTC et al. v. FMCSA*, and to stop publishing

SMS percentile rankings until after rulemaking, is an appropriate remedy.

### (f)  Federal Statutes Require the FMCSA to Encourage Competition, Efficiency and Small Businesses

NCLC's shipper members and other shippers are beneficiaries of federal

statutes and regulations intended to encourage competition, efficiency and free

enterprise (49 U.S.C. § 13101).  Under the authority of the Commerce Clause,

Congress has established a regulatory body (first the ICC and now the FMCSA)

with the delegated authority to determine which carriers are fit and not fit to

operate on the nation's roadways, and also has expressly required the Agency to

issue a final safety fitness determination on which the public can rely.  See 49

U.S.C. § 31144.

In removing economic regulation of the trucking industry, Congress

intended shippers to be able to have free choice with respect to routes, rates and

services, but with that freedom of choice and open marketplace Congress did not

impose a concomitant safety credentialing duty for shippers.

12

It simply is not and never has been the job of shippers to develop safety credentialing criteria or to artificially restrict their choice of service providers to carriers with unvetted percentile rankings published monthly on a website by a bureaucracy.  Under the comprehensive and preemptive scheme of federal regulation, shippers' legitimate business concerns relate to routes, rates and services.  NCLC's shipper members' legitimate business concern in choosing among authorized carriers is to obtain service designed to meet their distribution needs and to deliver confectionary products to customers on time and intact. Certifying carriers as safe to operate is within the exclusive expertise and delegated power of the FMCSA.

The principle that federal statutes trump state law is nothing new in the transportation industry.  Primacy of federal law has been the rule for almost a century with respect to the safe delivery of confectionary and other cargo.  For example, the Carmack Amendment (49 U.S.C. § 14706) establishes a level playing field which enforces a uniform standard for loss and damage to cargo that ensures that shippers will be paid at full actual value for cargo lost or damaged in transit regardless of the carrier's size, the location of the loss, or the domicile of the carrier, to the exclusion of any state law cause of action to the contrary.  *See Adams Express Co. v. Croninger*, 226 U.S. 491 (1913); *Rini v. United Van Lines*, 104 F.3d 502 (1st Cir. Mass. 1997); *Southern Express v. Pastime Amusement Co.*,

13

289 U.S. 28 (1936) (state law negligence claim is preempted); *Charleston &*

*Western Carolina Ry. Co. v. Varnville Furniture Co.*, 237 U.S. 597 (1915).

### (g) FMCSA's Effort to Deputize Shippers to "Raise the Safety Bar" Under Peril of State Law Liability Imposes New Rules and Duties on Shippers Contrary to Federal Statute

FMCSA's evident intent is to publish percentile rankings of carriers, force

the shipping public to become judge and jury of each carrier safety profile prior to

use, and choose only those ranked as "most safe" under an unproven methodology.

In a presentation to the Agency's hand picked Motor Carrier Safety Advisory

Committee on SMS methodology, FMCSA's Associate Administrator for

Enforcement, Bill Quade, recently stated, "the agency's mission is not to assure the

public that the trucking industry is safe. Under the best of circumstances, we are

not going to tell you who's safe. The system is designed to identify the people that

are so unsafe we need them out of business." (See Transport Topics, 10/22/12,

reproduced in Addendum 1 to Petitioners' brief at p. 52B.)

An examination of the May 16th release in light of this candid statement

demonstrates the Agency's intent to repudiate the effectiveness of its final safety

fitness determination, and to convert shippers from beneficiaries of the Agency's

expertise into vigilantes forced to police the industry utilizing unvetted

methodology to eliminate service providers based on rankings which change

month to month.

14

**(h)  Shippers are not Equipped to Make Safety Fitness Determinations**

In its May 16th release, the FMCSA states that SMS percentile rankings and methodology is published so that shippers and brokers can make proper "business decisions."  Correctly seen, shippers and brokers have no business trying to second guess the FMCSA's final safety fitness determination.  The Agency is delegated with the sole job of determining highway safety.  The Agency and not the shipping public has the expertise and the staff to make objective safety fitness determinations on a uniform basis.

The Agency function of certifying a vendor to the public as safe to operate and safe to use is a congressionally delegated and mandated duty of the Agency which it cannot transfer to the frightened shipping public by administrative fiat.  NCLC submits that a carrier found "fit to operate" on the nation's roadways by the FMCSA is "fit to use" by the shipping public.

**(i)  The Agency Lacks Authority to Renounce the Preemptive Effect of its Congressionally Mandated Safety Fitness Determination**

Under existing statute, NCLC shipper members are not required to second guess the Agency's SFD.  Likewise, NCLC carrier members who are authorized to operate are entitled to compete for shipper business on the basis of routes, rates and services without reference to an artificial percentile ranking imposed without due process or statutory warrant.

15

SMS methodology and percentile ranking of carriers is a constantly changing work in progress which the Agency has not submitted for scrutiny under the Administrative Procedure Act.  Yet, in the May 16th release, the Agency has presented the methodology in its current unvetted form as fit for use by shippers and brokers in second guessing the Agency's congressionally mandated safety fitness determination and regulations which require that determination to be made upon objective factors after an audit.  The May 16th release thus raises SMS methodology to the level of a new or different rule imposing new safety criteria, which currently brands over half of the carriers it measures as in some sense a higher safety risk which shippers use at their own peril.

The Court should make no mistake about the May 16th release.  The Agency is establishing for brokers and shippers a new peril not countenanced by statutes or existing regulations – the  peril of vicarious liability or negligent selection lawsuits – and no tinkering with the language can restore confidence in the Agency's ultimate SFD in the absence of Court ordered relief.

To NCLC's knowledge, never before has a federal agency, charged with making a safety fitness determination for the public's benefit, abdicated that responsibility and the preemptive effect of federal statutes under the Commerce Clause.  Yet, that appears to be precisely the Agency's intent in the May 16 release when it states, "Questions that concern private litigation matters, such as claims for

vicarious liability and negligent hiring, are outside the scope of FMCSA's area of responsibility."

The Agency was a party litigant in *NASTC et al. v. FMCSA* and learned full well therein of the public's concern over the plaintiff's bar's efforts to extend liability up the supply chain using state law concepts. It has been fully briefed by petitioners and others about the adverse economic impact on competition and small businesses which will result from the Hobson's choice of reduced competition or increased litigation which results from the Agency's repudiation of its existing rules and advocacy of state tort exposure.

In sum, petitioners submit that the Agency's May 16th guidance is far more than a mere interpretation or harmless extension of existing internal policies. It is the enunciation of a new unvetted safety fitness methodology imposed upon the public without notice and due process which is contrary to existing statutes and regulations and must be reversed.

## IV.  <u>Relief Sought</u>

WHEREFORE, NCLC prays for the following relief and asks this Honorable Court:

(1)    to admonish the Agency to adhere to its settlement in *NASTC et al. v. FMCSA*;

(2)     to direct that any statement inconsistent with that settlement be

immediately removed from the Agency's websites and other publications;

(3)     to direct the Agency to affirm that its Safety Fitness Determination for

each carrier is the sole safety standard for use by the public to the exclusion of

SMS methodology until completion of rulemaking or further order of the Court;

and

(4)     as a further prophylactic measure in light of the Agency's past misuse

of SMS data, to direct that the Agency cease public release of SMS data

concerning individual carriers until completion of rulemaking or further order of

the Court.

Dated: December 11, 2012                Respectfully submitted,


                                        /s/ Gerald K. Gimmel
                                        Gerald K. Gimmel, Esquire
                                        Gimmel, Weiman, Ersek, Blomberg &
                                        Lewis, PA
                                        4 Professional Drive, Suite 145
                                        Gaithersburg, MD  20879
                                        Tel: 301-840-8565
                                        Fax: 301-590-9784
                                        ggimmel@gweblaw.com

                                        *Counsel for the National Confectioners'*
                                        *Logistics Council, Inc.*

Attachments:

Addendum 1 (click-through page from SMS Website)
Addendum 2 (excerpt from American Transportation Research Institute study)

18

**<u>Certificate of Compliance</u>**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] it contains [*3,901*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [    ] it uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] it has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; or

    [    ] it has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>December 11, 2012</u>          <u>/s/ Gerald K. Gimmel            </u>
                                         *Counsel for Amicus*

19

**Certificate of Filing and Service**

I hereby certify that on this 11th day of December, 2012, I have caused the

foregoing "*AMICUS CURIAE* **BRIEF ON BEHALF OF NATIONAL**

**CONFECTIONERS' LOGISTICS COUNCIL, INC. IN SUPPORT OF**

**RELIEF SOUGHT BY PETITIONERS"** to be filed electronically with the

Clerk of the Court using the CM/ECF system, which will send notice of such filing

to the following registered CM/ECF users:

Paul M. Geier
Joy Park
Peter J. Plocki
U.S. Department of Transportation
1200 New Jersey Avenue, S.E.
Washington, DC 20590
(202) 366-4731

*Counsel for Respondents*

Matthew M. Collette
Jeffrey A. Clair
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
(202) 514-2000

*Counsel for Respondents*

David E. Frulla
Shaun M. Gehan
KELLEY DRYE &
    WARREN LLP
3050 K Street, N.W.,
    Suite 400
Washington, D.C. 20007
(202) 342-8400

Henry E. Seaton
SEATON & HUSK, L.P.
2240 Gallows Road
Vienna, VA 22182
(703) 573-0700

Mark J. Andrews
STRASBURGER &
    PRICE, LLP
1700 K Street, N.W.,
    Suite 640
Washington, D.C.
    20006
(202) 742-8601

*Counsel for Petitioners*

I further certify that on this 11th day of December, 2012, I caused the required number of bound copies of the above-referenced brief to be hand-filed with the Court.

/s/ Gerald K. Gimmel
Gerald K. Gimmel, Esquire
Gimmel, Weiman, Ersek, Blomberg &
Lewis, PA
4 Professional Drive, Suite 145
Gaithersburg, MD  20879
Tel: 301-840-8565; Fax: 301-590-9784
ggimmel@gweblaw.com

*Counsel for the National Confectioners'*
*Logistics Council, Inc.*

# **<u>Addendum</u>**

## <u>Table of Contents</u>

<u>**Addendum**</u>

Click-through Page from SMS Website ................................................Addendum 1

Excerpt from American Transportation Research Institute ...................Addendum 2

# **Addendum 1**

**Safety Measurement System Changes**

December 2012

The Federal Motor Carrier Safety Administration's (FMCSA) Safety Measurement System (SMS) quantifies the on-road safety performance and compliance history of motor carriers, to prioritize enforcement resources, determine the safety and compliance problems that a motor carrier may exhibit, and track each motor carrier's safety. FMCSA designed the SMS expecting that changes would be made as new data, and additional analysis became available. This release is the first in a series of expected improvements to the SMS that will take place periodically. FMCSA is providing a preview period and opportunity to comment for enforcement personnel and motor carriers prior to the implementation of these SMS changes. This document updates the June 2012 version previously posted, by including the four additional SMS changes and updating the language to reflect that all of the SMS changes will be implemented in December.

The first package of the SMS enhancements includes:

1. Strengthening the Vehicle Maintenance Behavior Analysis and Safety Improvement Category (BASIC) by incorporating cargo/load securement violations from today's Cargo-Related BASIC.
2. Changing the Cargo-Related BASIC to the Hazardous Materials (HM) Compliance BASIC to better identify HM-related safety and compliance problems.
3. Better aligning the SMS with Intermodal Equipment Provider (IEP) regulations.
4. Aligning violations that are included in the SMS with Commercial Vehicle Safety Alliance (CVSA) inspection levels by eliminating vehicle violations derived from driver-only inspections and driver violations from vehicle-only inspections.
5. More accurately identifying carriers that transport significant quantities of HM.
6. More accurately identifying carriers involved in transporting passengers.
7. Modifying the SMS Display to:
   - Change current terminology, "inconclusive" and "insufficient data," to fact-based descriptions.
   - Separate crashes with injuries from crashes with fatalities.

In addition, four other changes have been identified since the beginning of the preview period that will also be implemented in December. These are described in the August 2012 Federal Register Notice and are outlined below:

1. Removing 1 to 5 mph speeding violations
2. Lowering the severity weight for speeding violations that do not designate the mph range above the speed limit.
3. Aligning paper and electronic logbook violations
4. Changing the name of the Fatigued Driving (Hours-of-Service (HOS)) BASIC to the HOS Compliance BASIC

# **Addendum 2**



# 5.0 SHIPPER SURVEY FINDINGS

## 5.1 Shipper Demographics

In cooperation with NITL and ATA, ATRI collected responses from dozens of shippers representing tens of billions of dollars of freight movement (see Table 8). Shippers primarily contracted carriers to haul Truckload or Specialized loads (see Table 9), and 64.5 percent of shippers reporting they occasionally ship hazardous materials.

**Table 7. Company Revenue**

| Annual Revenue | Percent |
|---|---|
| $10 to $100 million | 6.5% |
| $101 to $500 million | 9.7% |
| $501 million to $1 billion | 12.9% |
| More than $1 billion | 64.5% |
| Don't Know | 6.5% |

**Table 8. Business Sectors Utilized**

| Type of Shipments | Percent |
|---|---|
| Private | 9.8% |
| Truckload | 44.6% |
| Less-than-Truckload | 14.4% |
| Specialized | 27.0% |
| Other Modes (e.g. Rail) | 4.3% |

## 5.2 Shippers and Existing Customers

CSA presents an abundance of new safety information to industry stakeholders including shippers, brokers, insurers, financial institutions and the general public, creating what has been referred to as a "ripple effect" through these business relationships.[58] Even with FMCSA excluding two BASICs from public view and issuing clear disclaimers that BASIC scores do not currently constitute official safety ratings concerning a carrier's fitness to operate, there is still confusion regarding how much weight should be assigned to above threshold BASIC scores.

More recently, it has been reported that CSA now factors in as only one consideration in a shipper's decision when selecting a carrier's services. Other factors may include previous relationships or contracts with the carrier, the carrier's historical performance and company profile, and whether an action plan is in place to address any existing safety liabilities.[59] However, shippers continue to contend that CSA appears to unofficially label certain carriers as unsafe for shippers to contract with, despite FMCSA's unwillingness to base actual SFDs on SMS scores.[60]

Although FMCSA indicates that CSA is not presently an SFD tool, the agency does encourage shippers and brokers to consider CSA as a valuable tool when selecting carriers to move freight. How much consideration a shipper should assign to CSA,

---

[58] Kilcarr, S. Safety enforcement up under CSA. *Fleet Owner*. September 22, 2011. Available Online: http://fleetowner.com/management/news/safety-enforcement-under-csa-0922/

[59] Solomon, M. B. Coping with CSA: Love it, hate it, or ignore it. *DC Velocity*. February 6, 2012. Available Online: http://www.dcvelocity.com/articles/20120206-coping-with-csa/

[60] Cassidy, W. B. CSA opponents head back to court. *Journal of Commerce*. July 19, 2012. Available Online: http://www.joc.com/government-regulation/asectt-files-lawsuit-challenging-csa-guidance



compared to other criteria, continues to be undefined and ambiguous. Since CSA scores are not outright safety ratings, many shippers feel it would be unwarranted to completely discontinue using carriers with substandard scores. In fact, despite 96.8 percent of shipper respondents indicating that they monitor the CSA scores of carriers they currently contract with (see Figure 24), only 27.6 percent of shippers have terminated an existing contract with a carrier based solely on information from CSA.

**Figure 24. Do You Access Carrier CSA Scores?**



While shippers portrayed a reluctance to terminate existing contracts due solely to CSA, respondents did cite concerns related to vicarious liability. A charge of vicarious liability is feared in instances where a contracted carrier becomes involved in an accident and the court determines the shipper did not provide adequate consideration to the carrier's CSA scores. Nearly two-thirds of shippers believe the threat of vicarious liability has increased due to CSA (see Figure 25).

**Figure 25. Has CSA Increased Liability Concerns?**



Based on these concerns, shippers expressed a desire to obtain all CSA information from carriers, including scores in the two non-public BASICs (Cargo-Related and Crash Indicator). In fact, 41.0 percent of carriers reported receiving these requests, although nearly a third refused to comply (see Figure 26). Supporting carriers' claims,



approximately half of shippers admitted to asking for non-public CSA scores. Specifically, 27.6 percent of shippers claimed it is standard practice to always ask all carriers for those scores, while an additional 20.7 percent only occasionally requested the scores, depending on familiarity with the carrier and/or the presence of warning signs discovered from other public data.

**Figure 26.  Are Shippers Requesting Non-Public Scores and Do You Comply?**



A large portion of shippers feel that, if decisions need to be based on CSA, all CSA data should be public.  Ultimately, due to the complexity of CSA and the potential for shippers to be held vicariously liable, shippers must establish their own rules for determining how best to utilize CSA data while continuing to contract with safe and experienced carriers who may happen to have above average BASIC scores.

For carriers with whom shippers have already established relationships, it is much more common for CSA to be used to further define the nature of that relationship.  Rather than terminate a contract outright, shippers will often require carriers with undesirable CSA scores to develop a Corrective Action Plan[61] for improving those scores and resolving safety and/or compliance problems.  Additionally, until carriers have lowered their scores, 44.8 percent of shippers reported that they may choose to utilize the carriers less often.

Based on progress toward the Corrective Action Plan and/or lowering above threshold CSA scores, shippers will periodically reevaluate whether carriers can be utilized regularly, whether further corrective steps need to be taken or whether the contract with the carrier needs to be terminated.  Alternately, it is worth noting that CSA is also capable of leading to favorable circumstances for carriers with positive CSA information. That is, 20.7 percent of shippers utilized carriers with good CSA scores more often as a result of those scores.

---

[61] A Corrective Action Plan is an informal agreement between motor carriers and shippers in order to align carrier practices with a shipper's standards.  This is distinct from a cooperative safety plan, which is a voluntary agreement between carriers and FMCSA as part of CSA.

## 5.3 Shippers and New Customers

Compared to the detailed process shippers traverse when evaluating CSA data concerning currently contracted carriers, it was reported that there is considerably less leeway given to prospective carriers. In these cases, when shippers are entering into new relationships, they rely much more on CSA to provide a glimpse into the carrier's operations. Fully 100 percent of shippers either check or plan to check CSA scores before contracting a new carrier for the first time (see Figure 27), and 50 percent asserted that poor CSA scores alone were sufficient reason to avoid contracting with a prospective carrier. As a result of CSA, then, the majority of shippers (60.7%) believe it is now somewhat or much more difficult to find qualified motor carriers to carry freight.

**Figure 27. Do You Access Carrier CSA Scores For Prospective Carriers?**



## 5.4 Key Shipper Findings

Supply chain impacts from CSA extend beyond the motor carriers and commercial drivers whose safety performance is being evaluated in the data. Shippers are also making business decisions and adjusting business relationships on the basis of CSA scores. Even so, shippers, like motor carriers, have concerns with the efficacy of CSA scores to predict carrier safety performance.

Shippers are evaluating CSA scores more rigorously for prospective carriers than for those with whom they have an existing business relationship. This increased scrutiny has resulted in the majority of shippers (60.7%) indicating that it is more difficult to find qualified carriers to haul freight since CSA's deployment, which is sure to present a problem as growing demand meets limited industry capacity.[62]

---

[62] Crissey, J. Who's in the driver's seat? Tightening regulations, unfavorable demographics have drivers in short supply. Will rising pay and operational shifts meet demand? *Commercial Carrier Journal, Randall Publishing.* July 1, 2011. Available Online: http://goliath.ecnext.com/coms2/gi_0198-779321/Who-s-in-the-driver.html



Existing shipper-carrier relationships are being impacted by CSA, but to a lesser degree. A majority of shipper respondents report that they monitor CSA scores of contracted carriers, yet only 27.6 percent of those shippers have used CSA scores as the sole basis for terminating a contract with an existing carrier. However, the potential for vicarious liability judgments against shippers for using carriers with poor CSA scores remains a concern, with 64.5 percent of shippers confirming increased liability expectations under CSA.